IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DEMETRICE SHANTE YOUNG, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No.  3:13-CV-03489-M |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are *Plaintiff's Brief*, filed January 13, 2014 (doc. 23), and *Defendant's Brief in Response to Plaintiff's Brief*, filed February 12, 2014 (doc. 26).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND[1]

### A.    Procedural History

Plaintiff Demetrice Shante Young seeks judicial review of a final decision by the Acting Commissioner of Social Security denying her claim for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act.  (R. at 20-22, 6-7.)  On January 9, 2008, Plaintiff applied for DIB and SSI, alleging disability beginning on December 18, 2007, due to lupus, low blood sugar, high blood pressure, diabetes, arthritis, ovarian cysts, and depression.  (R. at 32, 179, 483.)  Her claim was denied initially and upon reconsideration. (R. at 32, 179, 205-12, 218-23.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on April 8, 2009.  (R. at 32, 89-116,

---

[1] The background comes from the transcript of the administrative proceedings, which is designated as "R."

179, 224-29, 233-50.)  On July 28, 2009, the ALJ issued a decision finding Plaintiff not disabled. (R. at 32, 176-197.)  Plaintiff appealed.  (R. at 32, 252.)  While the appeal was pending, on February 26, 2010, Plaintiff filed a second application for DIB and SSI under Titles II and XVI of the Social Security Act.  (R. at 32, 478.)  She was granted DIB and SSI benefits on September 23, 2010, with an onset disability date of July 25, 2009.  (R. at 32.)  The Appeals Council found that the decisions by the ALJ and the state agency were inconsistent, reopened the favorable determination, vacated the unfavorable decision, and remanded the case for further proceedings.  (R. at 32, 202-204.)

At hearing was scheduled on remand for January 5, 2012.  (R. at 32, 58-88.)  Plaintiff was represented by counsel, but did not attend the hearing.  (R. at 32, 58-88, 258-83, 288-93.)  A hearing was scheduled for May 1, 2012, but Plaintiff was unable to appear because she was confined to a psychiatric hospital.  (R. at 32, 157-71, 294-319.)  A hearing was scheduled for June 13, 2012, and Plaintiff personally appeared and testified at the hearing.  (R. at 32, 117-56, 331-58, 361-79.)  The presiding ALJ issued a decision finding Plaintiff not disabled, on August 29, 2012.  (R. at 29.)

Plaintiff appealed on October 30, 2012.  (R. at 27-28.)  On April 5, 2013, the Appeals Council sent her a copy of the administrative records and a letter explaining that she may submit additional evidence or arguments "within 25 days of the date of this letter."  (Doc. 24 at 17.)  On April 30, 2013, the last day to submit new evidence or arguments, Plaintiff sent a letter requesting an extension of time.  (*Id.* at 15.)  The Appeals Council denied the request on the same day, incorrectly stating that "[t]he current diary expired April 25, 2013."  (*Id.* at 12.)  It denied Plaintiff's request for review on May 1, 2013, making the ALJ's decision the final decision of the Commissioner.  (R. at 20-22.)  Plaintiff filed a motion to reopen the Appeals Council's denial, and the Appeals Council denied the motion on July 18, 2013.  (R. at 6-7.)  Plaintiff timely appealed the

Commissioner's decision pursuant to 42 U.S.C. § 405(g). (*See* doc. 1.)

## B.     Factual History

### 1.     Age, Education, and Work Experience

Plaintiff was born on February 16, 1982, and was 25 years old at the time of the alleged onset date of December 18, 2007. (R. at 35, 390.) She completed ninth grade and had past relevant work as a check cashier, cashier, and lay away clerk. (R. at 126, 129-30.)

### 2.     Medical, Psychological, and Psychiatric Evidence

On March 18, 2008, Barbara Susanne Fletcher, Psy.D., a state agency psychological consultant (SAMC), conducted a clinical interview of Plaintiff for a disability evaluation. (R. at 738-41.) Dr. Fletcher found that Plaintiff "exhibited no evidence of thought disorder" and "no looseness of association, circumstantiality, or tangentiality." (R. at 739.) She further noted that Plaintiff had "[n]o delusions, overvalued ideas, obsessions, or illogical thinking[.]" (R. at 740.) Dr. Fletcher did find Plaintiff's mood depressed, however. (*Id.*) She diagnosed Plaintiff with major depressive disorder (MDD), recurrent with severe psychotic features–provisional. (*Id.*) Dr. Fletcher gave Plaintiff a global assessment of functioning (GAF) score of 48.[2] (R. at 741.) She stated that Plaintiff's "affective symptoms should improve with treatment." (*Id.*)

Later that same day, Plaintiff arrived at Baylor University Medical Center (Baylor) emergency room (ER) by ambulance because she became sick after taking some "pills" and alcohol. (R. at 709.) She claimed that she had been abused by her cousin, but declined to report the incident

---

[2] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001). A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV-TR) p. 32 (4th ed. rev.2000).

and declined a rape kit.  (R. at 709-11.)  Plaintiff later denied being sexually assaulted. (R. at 717.)
Her lab report showed that she had an abnormally high alcohol level, and she tested positive for
cocaine.  (R. at 722.)  Mark Stilley, M.D., discharged her with a diagnosis of alcohol and cocaine
abuse.  (R. at 718, 922.)

On April 3, 2008, Plaintiff went to Texas Health Presbyterian Hospital Dallas (Texas Health
Dallas) ER for cough, mouth pain, right ear pain, and back pain.  (R. at 3366.)  She suspected that
she was having a lupus flare-up[3] and requested "'hydrocodone' for her typical lupus flare up
symptoms."  (*Id.*)  A physical exam showed that all of Plaintiff's systems were normal except for
a cerumen impaction.[4]  (R. at 3367.)  There was no rash or erythema[5] on her skin, her mouth was
normal without any edema[6] or erythema, and she had normal range of motion of her back with no
tenderness.  (*Id.*)  Her discharge diagnosis was systemic lupus erythematosus (SLE),[7] and she was
prescribed hydrocodone.  (R. at 3358-59, 3360.)

---

[3]  Plaintiff had been diagnosed with discoid lupus prior to the disability onset date.  (*See* R. at 550.)

[4]  "Cerumen impaction happens when earwax becomes wedged in and blocks ear canal." *Cerumen Impaction*,
New York Medical Center (Sept. 23, 2014, 10:36 AM), http://www.med.nyu.edu/content?ChunkIID=100686.

[5]  "Erythema is a skin condition characterized by redness or rash." *Erythema*, University of Maryland Medical
Center (Sept. 23, 2014, 10:34 AM), http://umm.edu/health/medical/altmed/condition/erythema.

[6]  "Edema is the medical term for swelling.  It is a general response of the body to injury or inflammation."
*Edema Overview*, WebMD (Sept. 23, 2014, 10:49 AM), http://www.webmd.com/heart-disease/heart-failure/
edema-overview.

[7]  According to the United States National Library of Health by the Department of Health and Human Services,
National Institute of Health, "[s]ystemic lupus erythematosus (SLE) is an autoimmune disease in which the body's
immune system mistakenly attacks healthy tissue.  It can affect the skin, joints, kidneys, brain, and other organs. . . .
Almost everyone with SLE has joint pain and swelling.  Some develop arthritis.  The joints of the fingers, hands, wrists,
and knees are often affected. . . . Some people have only skin symptoms.  This is called discoid lupus." *Systemic lupus
erythematosus*, MedilinePlus, a service of the United States National Library of Health by the Department of Health and
Human Services, National Institute of Health (Sept. 23, 2014, 10:38AM), http://www.nlm.nih.gov/medlineplus/ency/
article/000435.htm.

On April 7, 2008, Jimmy Breazeale, M.D., an SAMC, completed a case assessment form. (R. at 760-61.)  Dr. Breazeale concluded that Plaintiff's medically determinable impairments were lupus, rheumatoid arthritis, and diabetes, but that they were not severe.  (R. at 760.)

On April 8, 2008, Charles Lankford, Ph.D., an SAMC, completed a Psychiatric Review Technique Form (PRTF).  (R. at 742-55.)  Dr. Lankford diagnosed Plaintiff with bipolar disorder. (R. at 745.)  He opined that she had mild restriction of daily living activities, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation of extended duration.  (R. at 752.)  Based on the clinical interview done by Dr. Fletcher on March 18, 2008, Dr. Lankford noted that Plaintiff "[was] able to care for her personal hygiene independently and self-administers medications; [s]he manage[d] her own doctor's app[ointments]; [s]he [ate] out, clean[ed] some, and [bought] her own toiletries; and [s]he ha[d] a driver's license and [was] able to count money and make change."  (R. at 754.)

Dr. Lankford also completed a mental residual functional capacity (RFC) assessment (MRFC).  (R. at 756-58.)  He noted in Section I of the MRFC that Plaintiff's medical history showed that she was moderately limited in three work-related abilities, including the ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions and complete a normal workday and workweek without interruptions from psychologically based symptoms, and to (3) perform at a consistent pace without an unreasonable number and length of rest periods.  (R. at 756.) She was not significantly limited in 17 abilities, including the ability to remember locations and work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary

5

tolerances. (R. at 756-57.) Dr. Lankford concluded that Plaintiff "[could] understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting." (R. at 758.) Finally, he stated that Plaintiff's "[a]llegations were partially supported by" the record. (*Id.*)

On May 16, 2008, Plaintiff was seen at Parkland Health & Hospital System ER for a toothache. (R. at 782-84.) She reported that it felt like a lupus flare-up, and she admitted to having used alcohol and drugs. (R. at 782-83.) Except for the toothache, all her systems were found to be normal. (*Id.*)

On May 24, 2008, Plaintiff complained of a toothache and was taken to Baylor ER by ambulance. (R. at 913-16.) She stated that she had collapsed, but no one witnessed it, and no injury was observed. (R. at 919.) Plaintiff admitted to using marijuana and drinking alcohol daily. (R. at 916, 919.) She was observed to be healthy in all areas with no spinal tenderness, full normal range of motion of her extremities, and normal gait. (*Id.*) Plaintiff was alert and oriented to person, place, and circumstance. (*Id.*) She was diagnosed with common fainting, dehydration, and syncope, unknown cause. (R. at 913.) Plaintiff was discharged soon after arrival but refused to leave the property and became verbally hostile. (R. at 917.) Baylor police escorted her out. (*Id.*)

Later that same day, Plaintiff was in the Dallas County Jail, and complained of a toothache. (R. at 773.) She was taken to Dallas County Jail Health and placed under suicide watch. (*Id.*) There, C. Llauger-Mier, M.D., a psychiatrist from Parkland, evaluated her and completed a mental health evaluation form. (R. at 764-69, 770, 773.) Plaintiff's chief complaint was the toothache. (R. at 764.) Dr. Llauger-Mier noted no depression, mania, or psychosis, and that Plaintiff had a history

6

of alcohol, cannabis, and cocaine abuse.  (R. at 764-65.)  Under medical history, Dr. Llauger-Mier noted that Plaintiff had diabetes and lupus.  (R. at 766.)  Dr. Llauger-Mier diagnosed Plaintiff with alcohol abuse, noted her acute dental pain, and assigned a GAF score of 75.[8]  (R. at 768.)

On July 9, 2008, Plaintiff's mother brought her to Parkland because of her bizarre behavior. (R. at 781.)  She reportedly claimed that she was hearing voices and stated repeatedly, "they are coming to get me."  (*Id.*)  Plaintiff was talking to herself "like she was possessed by demons[]" and had burned herself with cigarettes.  (R. at 852.)  Her mother reported that Plaintiff had used a lot of drugs over the Fourth of July weekend, and that she had not slept since.  (*Id.*)  She reported she had not been on any medications for a while, and that her last steroid use was one month earlier.  (R. at 846, 852.)  David Bobb, M.D., concluded that she needed a psychiatric hospitalization and assigned a GAF score of 30.[9]  (R. at 781, 849.)  A drug screening was conducted, but the results were negative.  (R. at 778.)  Plaintiff was prescribed hydrocodone, prednisone at 20 mg, and tramcinolone acetonide 0.1% cream.  (R. at 841.)  Rob Garrett, M.D., examined Plaintiff and reviewed her chart. He found no evidence of lupus, but her discharge diagnosis was psychosis, lupus, diabetes, and arthritis.  (R. at 854.)  She was transferred to Green Oaks Hospital that same day.  (R. at 843-44.)

On July 17, 2008, Plaintiff participated in a session with a caseworker at Metrocare Services (Metrocare).  (R. at 823-25, 1049-51.)  The session was devoted to educating her on managing her depression symptoms and her medications, because Plaintiff stated that she just stopped taking her

---

[8]  A GAF score of 71 to 80 indicates "no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  DSM–IV–TR at 34.

[9]  A GAF score of 21 to 30 indicates the individual's "[b]ehavior is considerably influenced by delusions or hallucinations" or the individual has a "serious impairment in communication or judgment . . . or [an] inability to function in almost all areas."  DSM–IV–TR at 34.

medications if she started feeling better.  (R. at 823, 1050.)  She was alert and oriented as to time, person, location, and situation.  (R. at 824.)

That same day,  Patrick Rabjohn, M.D., a psychiatrist, conducted a psychiatric diagnostic interview exam.  (R. at 826-29, 1046-48.)  He assigned Plaintiff a GAF score of 45.  (*Id.*)  She had no clear symptoms of psychosis and no consistent history of manic episodes, but he observed mood instability and increased irritability.  (*Id.*)  Plaintiff reported that she failed to take her medications. (R. at 828.)  She further reported that she drank 3-4 beers daily and used to drink hard liquor, but stated she had been sober for one week.  (*Id.*)  Plaintiff reported no significant drug abuse.  (*Id.*)

On July 28, 2008, Plaintiff again met with a Metrocare caseworker.  (R. at 817-19, 1041-42.) The caseworker noted that Plaintiff was not taking her medications every day and that she had used alcohol a week earlier.  (R. at 817.)  Plaintiff learned some techniques to deal with the stressors in her life and noted that she stated she "will try to be more positive and will try to avoid using alcohol and drugs as stress reducers."  (R. at 818.)  She was alert and oriented as to time, person, and location.  (*Id.*)

On July 30, 2008, Don Marler, Ph.D., completed a case assessment form.  (R. at 800-01.) Dr. Marler noted that he reviewed the PRTF and MRFC conducted on April 4, 2008, and he "affirmed [them] as written."  (R. at 800.)

On August 8, 2008, Plaintiff participated in another Metrocare session.  (R. at 814-15, 1039-40.) The caseworker noted that Plaintiff's weakness was poor medication skills, and she reenforced the need for Plaintiff to take her medications at the same time each day without taking illegal drugs or alcohol.  (R. at 815, 1039.)  Plaintiff was oriented as to time, person, and location, at the session, but she seemed to be depressed.  (*Id.*)

On August 19, 2008, Plaintiff was referred by Parkland ER to rheumatology for an examination of her lupus. (R. at 839.) She denied a history of joint pain or photosensitivity. (R. at 839.) The teaching physician resident noted a lesion of at least one centimeter, and another one smaller than five millimeters in her mouth, but her skin was clear otherwise, and there was no synovitis.[10] (*Id.*) The note referenced a "non-specific immunological finding" and myalgias. (R. at 840.) Plaintiff was referred to dermatology and ophthalmology. (*Id.*) She was prescribed hydrocodone, prednisone, and triamcinolone cream. (R. at 841.)

On the same day, Cecilier Chen, M.D., an SAMC, conducted an internal medicine consultative examination. (R. at 803-06.) She examined Plaintiff's back and found her spinal curvature had no abnormal appearance, and that she had "no tenderness on spine, no muscle spasm, [and] neck stiffness[.]" (R. at 805.) She found Plaintiff's muscle strength on both the upper and lower extremities to be 5/5. (*Id.*) All of Plaintiff's motor functions were fine. (*Id.*) Dr. Chen also noted the following: (1) "[l]upus, as per patient report, no official document to support, no active clinical finding; not on steroid, not [on] plaquenial [sic] medicine"; (2) "[h]yperglycemia episode, transient, secondary to steroid medicine"; (3) "[b]ronchitis, Acute condition, status post treatment, resolved"; (4) "[d]epression/anxiety, stress situation, not suicidal"; (5) "[t]obacco abuse"; and (6) "[h]istory of hearing problem, secondary to wax block[.]" (R. at 806.)

On August 25, 2008, Plaintiff participated in another session with a Metrocare caseworker. (R. at 871-73, 1029.) She stated that she could not live without alcohol, but she set a short-term goal to quit drinking and a long-term goal to buy a new car. (R. at 871-72.) She was alert and oriented

---

[10] Synovitis is an "[i]nflammation restricted to the lining of a joint (the synovial membrane)[.]" *Synovitis*, Encyclopedia Britannica (Sept. 23, 2014, 10:45 AM), http://www.britannica.com/EBchecked/topic/578570/synovitis.

as to time, person, location, and situation.  (R. at 872.)

On September 2, 2008, Kelvin Samaratunga, M.D., an SAMC, completed a case assessment form.  (R. at 832-33.)  Dr. Samaratunga listed Plaintiff's medically determinable impairments as lupus and history of acute bronchitis.  (R. at 832.)  He observed that prednisone for her lupus was stopped in May 2008, she was not on steroids, and her acute bronchitis was resolved.  (*Id.*)  Dr. Samaratunga stated that Plaintiff's allegations were partially supported by the record.  (*Id.*)

On September 11, 2008, Plaintiff went to Parkland ER by an ambulance.  (R. at 835-37.)  She complained of abdominal pain and joint pain in the pelvic region and at one time rated her pain at 10/10, but the staff observed no visible symptoms of pain, and Plaintiff conversed easily in an even and un-labored manner.  (R. at 837.)  Plaintiff left Parkland before being discharged.  (R. at 835.)

On September 18, 2008, Plaintiff went to Metrocare.  (R. at 862-65, 1031-33.)  She complained of insomnia and restlessness, but there was no sign of mania.  (R. at 864.)  Plaintiff reported that she did not take medications when prescribed and that she drank alcohol when she had racing thoughts and heard voices.  (*Id.*)

On November 5, 2008, a Metrocare outpatient treatment plan noted Plaintiff's principal diagnosis as MDD without psychotic features.  (R. at 856.)  Her GAF score was assigned at 45.  (*Id.*)  Her main problems were fleeting suicidal and homicidal thoughts, relapsing, and frequent mood swings.  (*Id.*)  The plan also noted alcohol and drug abuse.  (*Id.*)  That same day, Plaintiff participated in a session with a Metrocare caseworker.  (R. at 901-03, 1026-58.)  She reported that she was drinking alcohol every day because it helped her sleep.  (R. at 903, 1026.)  Plaintiff received assistance in filling out a food stamp application, and she promised to take all her medications and to keep her clinic appointments.  (*Id.*)

On November 10, 2008, Plaintiff again met with a Metrocare caseworker.  (R. at 897-900, 1023-25.)  She learned about housing options.  (R. at 898.)  Plaintiff was out of her medications and reported that she had been drinking every day; in her session, she learned the importance of being compliant with taking her medications and keeping her clinic appointments.  (R. at 898-99.)

On November 17, 2008, Plaintiff had a pharmacological management session at Metrocare. (R. at 893-96, 1019-21.)  She had been out of her medications for 14 days, even though she had ordered enough in September.  (R. at 895.)  She claimed that someone stole them from her car.  (*Id.*) The psychiatric history noted that Plaintiff had a problem with taking her medications.  (*Id.*)  She reported that she began drinking again when she had racing thoughts and heard voices.  (*Id.*)

On January 15, 2009, Plaintiff again met with a Metrocare caseworker.  (R. at 984-86, 1022.) Plaintiff admitted to being an alcoholic and using hydrocodone to numb her feelings, and she refused to take one of her prescribed medications because she thought it did not help.  (R. at 985.)  She also "reported that she [took] pain killers to handle her feelings of depression and [knew] that she [was] an addict, but [she was] not willing to do anything about it at this time."  (*Id.*)  The caseworker noted that Plaintiff's doctor had offered counseling, but she had not accepted the offer.  (*Id.*)

Plaintiff was involved in a car accident on February 11, 2009, and went to Baylor ER.  (R. at 925, 943.)  She complained of pain but was "cooperative, oriented, [and] tranquil[.]"  (R. at 943.) She was diagnosed with backache, low back pain, neck pain, alteration of consciousness, pain in thoracic spine, diabetes, tobacco use, and SLE, but the listed reason for the visit and the final diagnosis was acute back pain.  (R. at 926, 937, 951.)  X-rays of Plaintiff's chest, pelvis, and spine areas identified a potential spinal disruption, but a subsequent spinal CT scan found no spinal disruption.  (R. at 905-11, 942.)  Otherwise, no abnormalities were seen.  (R. at 908-11.)  CT scans

of her spine, head, and cervical spine revealed no abnormalities.  (R. at 905-07.)  She was discharged

on February 12, 2009.  (R. at 945.)

On February 26, 2009, Plaintiff was seen at Methodist Hospital of Dallas ER with a chief

complaint of an "[a]ltered [m]ental [s]tatus[.]"  (R. at 955-68.)  Urine analysis found some traces of

salicylate,[11] acetaminophen,[12] and alcohol.  (R. at 962.)  A chest x-ray and a CT scan of her head

showed no abnormalities.  (R. at 965-68.)  A Metrocare caseworker received an update on Plaintiff

from the hospital on February 27, 2009.  (R. at 971.)  The caseworker noted that Plaintiff was

hospitalized because she was noncompliant with her medications and needed medication

stabilization.  (*Id.*)

On February 27, 2009, Plaintiff was admitted to Green Oaks upon referral from Methodist

Hospital.  (R. at 1617.)  She was diagnosed with schizoaffective disorder and assigned a GAF score

of 45.  (*Id.*)  Her drug test was positive for benzodiazepines,[13] cocaine, and marijuana.  (R. at 1618.)

She "responded well to medication and therapy" and was discharged on March 1, 2009.  (R. at 1617.)

Plaintiff's discharge diagnosis was MDD severe with psychosis.  (R. at 1623.)

On March 14, 2009, Plaintiff presented at Parkland ER, complaining that she'd had a

headache for four days and that she had been out of plaquenil for one week.  (R. at 1110, 1116.)  A

CT scan of her head was normal.  (R. at 1110.)  She was admitted and examined by Sandeep

---

[11] "Salicylates are chemicals found naturally in plants and are a major ingredient in aspirin and other pain-relieving medications."  *Salicylate Allergy*, WebMD (Sept. 23, 2014, 10:48 AM), http://www.webmd.com/allergies/guide/salicylate-allergy.

[12] The common brand names for acetaminophen are Panadol and Tylenol.  *Acetaminophen*, WebMD (Sept. 23, 2014, 10:51 AM), http://www.webmd.com/drugs/2/drug-362/acetaminophen-oral/details.

[13] "Benzodiazepines are a type of medication known as tranquilizers.  Familiar names include valium and Xanax."  *Benzodiazepine Abuse*, WebMD (Sept. 23, 2014, 10:52 AM), http://www.webmd.com/mental-health/addiction/benzodiazepine-abuse.

Pandove, M.D. (R. at 1110-11, 1123.) Plaintiff denied any nausea, vomiting, diarrhea, dysuria, joint pain or chills and reported no new skin rashes. (R. at 1110.) Dr. Pandove consulted with rheumatology and restarted her on plaquenil. (R. at 1111.) A March 15, 2009 Magnetic Resonance Imaging (MRI) of Plaintiff's brain was unremarkable. (R. at 1154-55.) A March 16, 2009 x-ray of Plaintiff's cervical spine showed no cervical spine fracture. (R. at 1153.) Plaintiff was diagnosed with urinary tract infection, trichomonas,[14] and SLE. (R. at 1111.) She was told to set a follow-up appointment with the rheumatology clinic in 1-2 weeks and discharged on March 17, 2009. (R. at 1110-11.)

On March 26, 2009, Plaintiff met with a Metrocare caseworker. (R. at 1008, 1012-13.) She admitted to using alcohol again and abusing hydrocodone, which had been prescribed to her for lupus. (*Id.*) Plaintiff was taught the importance of taking her medications every day as prescribed. (*Id.*) The caseworker concluded that she was resistant to being medication-compliant. (R. at 1013.) She also noted Plaintiff's history of being very difficult to engage in skills training. (*Id.*)

Plaintiff went to a pharmacological management appointment at Metrocare later that same day. (R. at 1015-17.) She noted that she drank daily and did not take prescribed medications. (R. at 1015.) She had been out of her medications for 14 days, even though she had gotten a refill for a sufficient amount. (R. at 1016.) Plaintiff reported that she did not take her prescribed medications, except for hydroxyzine. (*Id.*)

On April 20, 2009, Gary Watkins, an advanced practice nurse (APN), completed a medical release/physician's statement form. (R. at 1087.) The form reflected that Plaintiff had MDD and

---

[14] Trichomoniasis "is a sexually transmitted disease . . . caused by a small organism called *Trichomonas vaginalis*. *Trichomoniasis*, WebMD (Sept. 23, 2014, 10:54 AM), http://www.webmd.com/sexual-conditions/guide/trichomoniasis.

lupus, and that her "disability [was] not permanent and [was] expected to last more than 6 months." (*Id.*)

That same day, Plaintiff also again met with a Metrocare caseworker. (R. at 1091.) She reported that she had been taking her medications, and that her depression symptoms had lessened. (R. at 1091.) She was oriented and had no suicidal or homicidal inclinations. (*Id.*)

On April 29, 2009, Candice P. McNeil, M.D., saw Plaintiff at Parkland ER for her complaint of loss of consciousness. (R. at 1107, 1118.) A physical exam revealed no abnormality. (R. at 1108.) A CT angiography of Plaintiff's chest was unremarkable, aside from small cysts or bullae that may be "early manifestations of lupus interstitial disease." (R. at 1152.) Michael Landay, M.D., did not believe any further lung imaging was necessary. (*Id.*) The final diagnosis was lupus erythematosus and hypertension. (R. at 1108.) Dr. McNeil noted that Plaintiff had either no-showed or cancelled the last eight rheumatology appointments, and that the next appointment was scheduled the following day. (*Id.*) The discharge instruction stated: "You were seen in the Emergency Room for chest pain, back and neck pain, and headache. A CT scan of your chest and blood laboratory studies were unremarkable and did not demonstrate the cause of your pain. Your blood test do [sic] not indicate an acute lupus flare. You should follow up in the Rheumatology Clinic tomorrow as scheduled." (R. at 1157.)

On April 30, 2009, Plaintiff went to the rheumatology clinic and complained of back pain. (R. at 1001-03.) She reported a history of SLE, but the rheumatologist noted that her symptoms did not meet the criteria for SLE. (R. at 1001-02.)

On May 4, 2009, Plaintiff participated in another session with a Metrocare caseworker. (R. at 1073-74.) Plaintiff reported that she was compliant with taking her medications. (R. at 1074.)

14

The caseworker assisted her with seeking identification documents so that she could receive food stamps and a social security card.  (*Id.*)

On May 5, 2009, Plaintiff went to Parkland for a rheumatology appointment.  (R. at 999-1000, 1160.)  She was seen for discoid lupus[15] on her scalp and back pain.  (*Id.*)  A rheumatology physician resident's note stated that there was no evidence of SLE.  (R. at 1000.)  The note also stated that Plaintiff's back pain was likely caused by a muscle strain, and that it should improve with better posture and development of core muscle strength.  (*Id.*)

On June 16, 2009, Plaintiff again met with a Metrocare caseworker.  (R. at 1055-57.)  She reported that she was out of her medications, and that she had taken more medications than what was prescribed to her.  (R. at 1055-56.)  Plaintiff was taught the importance of being compliant with her prescribed medications.  (R. at 1057.)

On July 15, 2009, Plaintiff was seen at Texas Health Dallas ER.  (R. at 3330, 3345.)  She complained of abdominal pain, constipation, and menstrual problems.  (R. at 3339, 3343, 3345.)  A physical examination resulted in normal findings.  (R. at 3330.)  A pelvic ultrasound, however, found two large ovarian cysts,[16] which were likely hemorrhagic.  (R. at 3331, 3341-42.)  The discharge diagnoses were constipation, abdominal pain, and ovarian cysts.  (R. at 3344.)

On July 20, 2009, Plaintiff met with a Metrocare caseworker.  (R. at 1195-96.)  She was instructed on the importance of taking her medications as prescribed and attending medical

---

[15]  "Discoid lupus erythematosus" is defined as "a form of lupus erythematosus in which cutaneous lesions are present; these commonly appear on the face and are atrophic plaques with erythema, hyperkeratosis, follicular plugging, and telangiectasia; in some instances systemic lupus erythematosus may develop," STEDMAN'S MEDICAL DICTIONARY 1124 (28th ed.2006).

[16]  Cysts are fluid-filled sacs that can form in the ovaries.  They are very common." *Ovarian Cysts and Tumors*, WebMD (Sept. 23, 2014, 10:55 AM), http://www.webmd.com/women/guide/ovarian-cysts.

appointments as scheduled.  (R. at 1195.)  Plaintiff was also given "corrective feedback . . . about

drinking while on medication."  (R. at 1196.)

Plaintiff went to Parkland ER for generalized body aches on July 26, 2009.  (R. at 1101,

1112.)  Sunti S. Srivathanakul, M.D., noted Plaintiff's complaints of body aches, dizziness, and

abdominal pain, but tests revealed no abnormal findings.  (R. at 1105.)  The final diagnosis was

lupus erythematosus and hypertension.  (R. at 1102.)  Plaintiff returned to Parkland ER on August

12, 2009, for a lupus flare-up and abdominal pain.  (R. at 1139.)  She reported that the day before

she had started having a headache and generalized joint and muscle ache.  (*Id.*)  A physical

examination showed mucus in her nose and tenderness on palpation to chest, abdomen, and all

extremities.  (R. at 1140-41.)  No rash or edema were noted.  (R. at 1141.)  Plaintiff was given

steroids and pain medication.  (*Id.*)  Shahla Escobar, M.D., recommended that she follow up with

her primary care provider and pain clinic referrals, and that she make an appointment with a

rheumatologist.  (R. at 1142.)  Her discharge diagnoses were SLE and unspecified abdominal pain.

(*Id.*)  Two days later, Plaintiff returned to Parkland ER for joint pain and generalized body ache.  (R.

at 1135.)  Justin Neff, M.D., noted that she had been there two days before and had responded to a

steroid therapy and pain medication, but she had not taken any of the new medications at home.  (*Id.*)

A physical examination showed that Plaintiff's systems were normal, except for some tenderness

in her abdomen.  (R. at 1136.)  Her skin was dry, and no rash was detected.  (*Id.*)

On August 15, 2009, Plaintiff went to Parkland ER for back pain, but she was transferred to

Parkland psych ER due to her mother's allegation that she had taken a whole bottle of pills a few

days before and during the last month.  (R. at 1126, 1610.)  Nasir Zaki, M.D., examined Plaintiff and

found that she had been off her medications for two to three weeks.  (R. at 1127.)  Plaintiff was

hospitalized and observed.  (R. at 1130.)  Her grandfather reported that she had been depressed for the past few weeks and that she had been drinking heavily, 2-3 beers and 1-2 drinks of liquor daily. (*Id.*)  She was transferred to Green Oaks and admitted for "detox/psych related[.]"  (R. at 1610.)  Her drug screen was positive for cannabis, benzodiazepine, and opiates.  (R. at 1612.)  She had disorganized thinking, pressured speech, and paranoia when she was first presented, but "exhibit[ed] no signs of disorganized thought process or psychosis" the next day.  (R. at 1611-12.)  The discharge diagnosis was schizoaffective disorder.  (R. at 1612.)

On August 18, 2009, Plaintiff participated in another session with a Metrocare caseworker. (R. at 1182.)  She complained that she tested positive for illegal drugs when she was admitted into a hospital, but she denied taking any illegal drugs.  (*Id.*)  During the session, the caseworker instructed Plaintiff about the importance of taking her medications and attending all medical appointments as scheduled.  (R. at 1183.)

After an ultrasound of Plaintiff's pelvis area at Parkland on September 8, 2009, Matthew Fiesta, M.D., observed a one-centimeter hemorrhagic cyst in the right ovary.  (R. at 1149.)

On September 12, 2009, Plaintiff presented at Parkland for generalized body aches stemming from a lupus flare-up.  (R. at 1258-59, 1262.)  She had been out of prednisone for about three days and wanted to refill her prednisone and plaquenil.  (R. at 1258-59.)  A physical examination noted generalized pain in the abdomen area, exudates[17] on her tonsil, and tachycardia.[18]  (R. at 1260-61.)

---

[17]  "Exudate is fluid, such as pus or clear fluid, that leaks out of blood vessels into nearby tissues.  The fluid is made of cells, proteins, and solid materials.  Exudate may ooze from cuts or from areas of infection or inflammation." *Exudate*, MedlinePlus, a service of the U.S. National Library of Medicine and National Institute of Health (Sept. 23, 2014, 10:56 AM), http://www.nlm.nih.gov/medlineplus/ency/article/002357.htm.

[18]  "A heart rate of more than 100 beats per minute (BPM) in adults is called tachycardia." *Tachycardia/Fast Heart Rate*, American Heart Association (Sept. 23, 2014, 10:58 AM), http://www.heart.org/HEARTORG/Conditions/Arrhythmia/AboutArrhythmia/Tachycardia_UCM_302018_Article.jsp.

No rash on her skin and no edema or tenderness around her joints were noted.  (R. at 1261.)  Jordan Smith, D.O., noted that Plaintiff felt better after taking medications and fluids.  (R. at 1258.)  Plaintiff's chest x-ray showed "no significant radiographic abnormality . . . [and n]o significant interval change from [the] prior film [dated April 29, 2009.]"  (R. at 1148.)  Plaintiff was diagnosed with lupus and she was advised to make an appointment with rheumatology.  (R. at 1262-63.)

On September 28, 2009, Plaintiff participated in a session with a Metrocare caseworker.  (R. at 1211-12.)  She sought help from the caseworker to connect her to the clinic because she was out of her medications.  (R. at 1211.)  Plaintiff saw APN Karla Lucas at Metrocare for her medications.  (R. at 1208-10.)  APN Lucas noted that Plaintiff had picked up 90 pills of lorazepam seven days earlier and that over half of them were already gone.  (R. at 1208.)  She further observed that Plaintiff had MDD with anxiety and had misused benzodiazepine.  (R. at 1209.)

On October 8, 2009, Plaintiff participated in a session with a new Metrocare caseworker.  (R. at 1241-43.)  She reported compliance with her medications.  (R. at 1242.)  That same day, APN Watkins noted that Plaintiff had no functional impairments and reported no substance abuse, and her MDD rating was none, but she had poor insight and judgment.  (R. at 1244-45.)

On October 26, 2009, APN Watkins completed a medical release/physician's statement form.  (R. at 1233.)  The form noted Plaintiff's MDD, racing thoughts, inability to concentrate and focus, isolation problems in relationships, and inability to take instructions, handle stress or manage anger.  (*Id.*)  She had insomnia, panic attacks, restlessness, and no self-esteem, and she suffered mood swings ranging from hopelessness to aggressive anger.  (*Id.*)  The form indicated that her disability was not permanent, but was expected to last more than six months.  (*Id.*)

On November 6, 2009, Plaintiff went to Parkland ER for generalized body aches.  (R. at

1251-53, 1257.)  A physical examination found tenderness to palpation in the mid-sternal area and upper thoracic spine, and bilateral muscular tenderness.  (R. at 1253.)  Pain stemming from ovarian cysts was also noted.  (*Id.*)  A chest x-ray showed no significant abnormality.  (R. at 1268-69.)  The ER diagnosis was SLE, and she was prescribed hydrocodone.  (R. at 1257.)

On December 3, 2009, Plaintiff met with a Metrocare caseworker and reported that she was medication-compliant; she denied any suicidal or homicidal ideation.  (R. at 1222, 1224.)  On the same day, APN Watkins saw Plaintiff regarding her medications.  (R. at 1225-28.)  He found that her functional impairment was moderate, her substance abuse was low, and her MDD was moderate.  (R. at 1225.)  He prescribed zoloft for her depression.  (R. at 1226-28.)

On December 7, 2009, Plaintiff met with Stephen Mabry, a vocational rehabilitation counselor from Texas Department of Assistive and Rehabilitative Services (DARS).  (R. at 3190.)  Mr. Mabry and Plaintiff discussed the obstacles to her obtaining employment, including the lack of a GED and her physical and mental health issues.  (R. at 3188-90.)

On January 6, 2010, a DARS consultant reviewed Plaintiff's medical records and concluded that Plaintiff's "mental [and] physical conditions [were] stable and should not be an impediment to [the DARS vocational rehabilitation] services[.]"  (R. at 3182-83.)

On January 25, 2010, Plaintiff met with Mr. Mabry, the DARS vocational rehabilitation counselor.  (R. at 3181.)  He noted that a DARS medical consultant had reviewed Plaintiff's medical records and concluded that her lupus was in stable condition.  (*Id.*)  Mr. Mabry and Plaintiff discussed the possibility of her seeking certified nursing assistant (CNA) training.  (*Id.*)

On February 23, 2010, Plaintiff was seen at Parkland for a headache that had lasted for over two days.  (R. at 1291.)  She declined to go to the ER and asked for pain medication.  (R. at 1292-

93.)  Muhammad Sattar, M.D., referred her to rheumatology for re-evaluation.  (*Id.*)

On March 19, 2010, Plaintiff met with Mr. Mabry at DARS for training services.  (R. at 3177.)  They discussed the available CNA training options, and Plaintiff chose Texas Career Institute.  (*Id.*)

On April 1, 2010, Plaintiff called her caseworker at Metrocare and left a message.  (R. at 1347.)  She indicated that she had returned to school and that it had been good for her.  (*Id.*)

On April 15, 2010, APN Watkins saw Plaintiff as a walk-in at Metrocare.  (R. at 1344-46.)  He told her that he would not change her medications because "she ha[d] unrealistic expectations and d[id] not let [the medications] work before changing again."  (R. at 1344.)

On April 27, 2010, Plaintiff was seen at Parkland ER for abdominal pain, chest pain, nausea, headache, dizziness, and joint pain "all over" that she claimed was similar to a lupus flare-up.  (R. at 1284.)  Jennifer Griffith, M.D., noted that Plaintiff had disappeared for over an hour but "was seen walking in the hallways and very well appearing in general."  (*Id.*)  On initial examination, Plaintiff did not complain of any weakness, sensory deficit, or vision changes.  (*Id.*)  She reported itchy rash on her right upper extremity that had spread to her chest and upper back.  (*Id.*)  Plaintiff was not cooperative with a physical examination.  Dr. Griffith noted that she had hives on her right upper extremity arm, forearm, and some chest and upper back, but she had normal range of joint motion, and no edema was observed.  (R. at 1286.)  While at Parkland, Plaintiff's right upper extremity became numb.  (R. at 1284.)  She was sent to the neurology department, but the findings were normal.  (R. at 1283.)  A head CT scan showed no abnormalities, and her chest x-ray also revealed no changes from the last scan.  (R. at 1283, 1287-88.)  After treatment, the rash she complained of was less prominent, and she complained of no itchiness in her throat or difficulty breathing.  (R. at

20

1281.)  She was discharged with steroids, zantac, and benadryl.  (R. at 1281.)

On June 27, 2010, Plaintiff went to United Regional ER for a headache and back pain that she suspected was caused by a lupus flare-up.  (R. at 1322, 2138.)  A physical examination showed no rash on her skin, full range joint of motion, and no edema.  (R. at 1323, 2149-50.)  A pregnancy test was positive.  (R. at 1324-25, 2151.)  A chest x-ray showed no abnormalities.  (R. at 2152.)  Her discharge diagnoses were migraine headache, pregnancy, and SLE.  (R. at 2153, 2170.)

On July 7, 2010, Plaintiff was seen at United Regional ER because of back pain, neck and joint stiffness, and migraine.  (R. at 1315, 2096.)  She reported that she stopped taking her lupus medication after she learned that she was pregnant.  (R. at 1315, 2098.)  Plaintiff also reported that she had sores on her head.  (R. at 2112.)  A physical examination revealed that all other systems were normal.  (R. at 2102-03.)  Plaintiff's headache improved after being injected with morphine, and she was discharged.  (R. at 1318, 2106.)  The discharge diagnoses were headache and seborrheic dermatitis[19] (seborrhea).  (R. at 2135.)

On July 14, 2010, Plaintiff went to United Regional ER for low back pain.  (R. at 1310, 2076.)  She reported that she did not take any medication for the pain.  (R. at 2076.)  All systems were normal, and she was given pain medications and was discharged.  (R. at 1310-12.)  The discharge diagnoses were urinary tract infection and first trimester pregnancy.  (R. at 2093.)

On July 18, 2010, Plaintiff was seen at United Regional ER for cough, congestion, and migraine.  (R. at 2031.)  She was discharged on the same day, and her discharge diagnoses were

---

[19] "Seborrheic (seb-o-REE-ik) dermatitis is a common skin condition that mainly affects your scalp.  It causes scaly patches, red skin and stubborn dandruff.  Seborrheic dermatitis can also affect oily areas of the body, such as the face, upper chest and back."  *Seborrheic dermatitis*, Mayo Clinic (Sept. 23, 2014, 10:59 AM), http://www.mayoclinic.org/diseases-conditions/seborrheic-dermatitis/basics/definition/con-20031872.

migraine, bronchitis, and pregnancy.  (R. at 2043.)

On July 20, 2010, Plaintiff presented at United Regional ER for vomiting and diarrhea.  (R. at 1991, 2000.)  She was cooperative, alert, and oriented as to time, place, and person.  (R. at 1996.)  Her skin was normal and no swelling or tenderness around her joints were observed.  (R. at 1996-97.)  All of Plaintiff's systems were normal, and she was discharged on the same day.  (R. at 2011.)

On July 26, 2010, Barbara Susanne Fletcher, Psy.D., an SAMC who Plaintiff had seen more than two years earlier, conducted another clinical interview for disability evaluation.  (R. at 1271-75.)  She noted that Plaintiff would be unable to manage benefit payments on her own, but she understood the meaning of filing for benefits.  (R. at 1271.)  Dr. Fletcher diagnosed Plaintiff with schizoaffective disorder bipolar type-provisional and assigned a GAF score of 40,[20] provisional.  (R. at 1275.)  She also noted that the "[p]rognosis for schizoaffective disorder is better than schizophrenia, but considerably worse than the prognosis for mood disorders. . . . [and that s]ubstantial occupational and social dysfunction are common."  (*Id.*)

On July 29, 2010, Plaintiff presented at Parkland ER for nausea, vomiting, sore throat, headache, and generalized pain.  (R. at 1278.)  She was 9-10 weeks pregnant.  (R. at 1280.)  Plaintiff suspected that she was having a lupus flare-up.  (R. at 1278-79.)  She reported getting sores in her mouth two days earlier and a scaly rash on her scalp, but she denied any joint pain or swelling.  (R. at 1278.)  Plaintiff reported that she stopped taking plaquenil, on the advice of a doctor when she became pregnant, but she continued taking lisinopril.  (*Id.*)  She was advised to take plaquenil and stop taking lisinopril.  (R. at 1280.)  Her pain was reportedly gone after taking tylenol, and she was

---

[20] A GAF score of 31-40 indicates some impairment in reality testing or communication, or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  DSM–IV–TR at 34.

22

discharged.  (*Id.*)

On August 5, 2010, Plaintiff met with APN Watkins for a routine follow-up appointment. (R. at 1335-38.)  He noted that Plaintiff had no functional impairments, no housing instability, no substance abuse, and no MDD.  (R. at 1335.)  Plaintiff reported that she would hallucinate if she went without her medications.  (R. at 1337.)  APN Watkins prescribed her trazodone.  (*Id.*)  On the same day, he completed a NorthSTAR Outpatient Authorization Tools & Treatment Plan form.  (R. at 1333-34.)  He noted that Plaintiff's principal diagnosis was MDD with psychotic features and assigned her a GAF score of 45.  (R. at 1333.)  He noted that there was no current risk of harm by Plaintiff to herself or others, and that she had abundant natural and community supports, no psychiatric-related hospitalizations in the past 180 days, no functional impairment, no housing instability, and that there was no need or desire for Plaintiff to work.  (*Id.*)  APN Watkins also noted that Plaintiff had not abused any illegal substance in the past year and had not been involved with the criminal justice system in the past 90 days.  (*Id.*)

On August 25, 2010, Mr. Mabry, from DARS, attempted to contact Plaintiff, but that her telephone number was no longer in service.  (R. at 3171.)

On September 17, 2010, Stella Nwankwo, M.D., completed an internal medicine consultative examination of Plaintiff, at the request of Texas Rehabilitative Commission.  (R. at 1296-99.)  Dr. Nwankwo noted that Plaintiff was alert and oriented.  (R. at 1298.)  She observed discoid lupus lesions on Plaintiff's scalp.  (*Id.*)  Plaintiff's spine examination showed full range of motion in all areas, without pain.  (R. at 1299.)  Her upper and lower extremities had full range of motion, but with complaints of pain.  (*Id.*)  Dr. Nwankwo's diagnostic impressions were as following: "1. [h]istory of lupus erythematosus as per [Plaintiff]"; "2. [m]ultiple joints pain as per claimant, normal

left ankle x-ray report."; "3. [h]istory of hypertension, controlled"; "4. [h]istory of diabetes mellitus as per claimant, [d]iet controlled"; "5. [h]istory of ovarian cyst"; and "6. [h]istory of depression/bipolar disorder." (*Id.*)

On January 1, 2011, Plaintiff arrived at United Regional ER by ambulance for dizziness and blurred vision. (R. at 1840, 1849.) She was eight months pregnant. (*Id.*) Plaintiff's discharge diagnoses were urinary tract infection, trichomonas infection, and near syncope. (R. at 1862.)

On January 8, 2011, Plaintiff was admitted to United Regional for a lupus flare-up. (R. at 1412.) She was 33 weeks and 2 days pregnant. (*Id.*) Lawrence Young, M.D., observed that Plaintiff "indeed seemed like she was having aches and flare up of her lupus[.]" (*Id.*) He noted that she had "an elevated sed rate." (*Id.*) Plaintiff was given steroids through an IV and orally when her symptoms improved. (*Id.*) A CT scan of her brain was normal. (R. at 1668.) Her symptoms improved with the steroid therapy, and she was discharged on January 13, 2011. (*Id.*) The final diagnoses were intrauterine pregnancy of 33 weeks with a lupus flare-up resolved, and fetal arrhythmia. (*Id.*)

Plaintiff gave birth on February 18, 2011. (R. at 1444, 1450, 1791.)

On March 1, 1011, Plaintiff went to United Regional ER again for pelvic pain and vaginal infection. (R. at 1706, 1714-15.) She was alert and oriented as to time, place, and person. (R. at 1711.) No swelling or tenderness in her joints was observed, Plaintiff had full and active movements of all extremities, and her skin was normal. (R. at 1712, 1719.) She was discharged on the same day with a diagnosis of pelvic pain. (R. at 1722, 1739.)

Plaintiff saw Russell Williams, M.D., at Community Healthcare Center in Wichita Falls, on March 8, 2011. (R. at 1485-86.) She reported that she had a history of lupus that was first diagnosed

at Parkland. (*Id.*)  Plaintiff reported that she had not seen a rheumatologist in the area except when she went to the hospital. (R. at 1486.)  She had been put on steroids when she was in the hospital, and she was continued with plaquenil, but no other prescription drugs. (*Id.*)  Plaintiff reported that she had just run out of plaquenil. (*Id.*)  Dr. Williams noted that all of Plaintiff's systems were normal, and he did not observe any joint effusion. (*Id.*)  He concluded that Plaintiff's lupus seemed to be "under fair control." (*Id.*)  Dr. Williams refilled plaquenil for her and set up an appointment with another doctor. (*Id.*)  Plaintiff returned to Dr. Williams on June 17, 2011. (R. at 1480.)  A physical exam revealed a slightly high blood pressure reading, but her lungs were clear, her heartbeat was regular, and her abdomen was unremarkable. (*Id.*)  Plaintiff reported a history of negative liver function. (*Id.*)  Dr. Williams noted that Plaintiff had a history of SLE, which was stable. (*Id.*)  Plaintiff reported that the rheumatology department at Community Healthcare Center did not take Medicaid, even though she did not have Medicaid. (*Id.*)  Dr. Williams recommended that she find a rheumatologist in the next few weeks. (*Id.*)

On October 6, 2011, Plaintiff was examined for dental pain and headache by Alexis Geslani, M.D., at Texas Health Arlington ER. (R. at 1526, 1529.)  She reported that she had been seen at an ER one week prior and was given antibiotics and instructed to follow up with the dental clinic. (R. at 1526.)  Plaintiff had been at the dental clinic that day, and her tooth was pulled, but her pain did not subside even after taking pain medication. (*Id.*)  She reported that she had diabetes and hypertension, but they were gestational and had resolved after she gave birth. (*Id.*)  She was alert and oriented as to person, place, and time. (R. at 1527.)  Her neck and joint motion range were normal. (*Id.*)  She was discharged with a hydrocodone prescription. (R. at 1528.)

On October 15, 2011, Plaintiff went to Texas Health Arlington ER for numbness of her body.

25

(R. at 1507, 1509.)  She reported that when she moved around, she had constant back pain, and the symptoms were similar to a lupus flare-up from over a year ago.  (R. at 1509.)  Plaintiff reported that she quit smoking, but she did drink alcohol.  (*Id.*)  She was alert and oriented to person, place, and time, and her judgment and thought content were normal.  (R. at 1510.)  A physical examination showed that aside from her "[s]ubjective generalized weakness[,]" all her systems were normal.  (*Id.*)  A urine drug screen was negative for any illegal substance.  (R. at 1512, 1517.)  A CT scan of her head showed no abnormalities.  (R. at 1513.)  When discharged, Glenn Hardesty, D.O., diagnosed her with SLE and muscle pain and prescribed her hydrocodone and prednisone.  (R. at 1520, 1522.)

On October 23, 2011, Plaintiff saw Jon Breezley, D.O., at Texas Health Arlington ER, for back pain.  (R. at 1542, 1548, 1551.)  She was alert and oriented as to person, place, and time.  (R. at 1549-50.)  She had normal range of joint motion, but complained of pain in her back.  (R. at 1549.)  An x-ray on her spine showed no abnormality aside from a mild scoliosis.  (R. at 1548.)  The discharge diagnoses were back pain, musculoskeletal pain, and lupus.  (R. at 1553.)  Plaintiff was discharged with pain medication.  (R. at 1552, 1554.)

On November 7, 2011, Plaintiff saw Nahla Berg, M.D., at Texas Health Arlington ER, for back pain.  (R. at 1563, 1565.)  She was alert and oriented as to person, place, and time.  (R. at 1566.)  A physical examination noted that except for Plaintiff's reported pain in her back, all other systems were normal.  (*Id.*)  No tenderness or edema was found around her joints, and no rash was noted on her skin.  (*Id.*)  Dr. Berg noted that Plaintiff had "drug seeking behavior", and he discussed her multiple recent visits for pain and her need to make an appointment with the rheumatology department.  (*Id.*)  Plaintiff was discharged in stable condition with a diagnosis of chronic back pain. (R. at 1568-69.)

On November 15, 2011, Plaintiff saw Julie Gorchynski, M.D., at Tarrant County Hospital District ER, for back pain.  (R. at 1588.)  Her primary diagnosis was muscle spasm and her secondary diagnosis was lumbago (back pain).  (*Id.*)  She was discharged in stable condition.  (R. at 1589.)

On November 21, 2011, Plaintiff saw Arun Raghavan, M.D., at Plaza Medical Center ER, for back pain.  (R. at 3370.)  She was prescribed vicodin for pain and flexeril for muscle spasm.  (*Id.*)  Plaintiff's discharge diagnosis was back pain.  (*Id.*)

On November 23, 2011, APN Lucas conducted a psychiatric diagnostic interview exam of Plaintiff at Metrocare.  (R. at 2196-99.)  She observed that Plaintiff had a moderate functional impairment, high employment problems, and no co-occurring substance use.  (R. at 2196.)  APN Lucas also noted that Plaintiff had used marijuana and cocaine three to four years ago.  (R. at 2197.)  Plaintiff reported that she responded well to medication.  (R. at 2198.)  Her tentative diagnoses were schizoaffective disorder and posttraumatic stress disorder (PTSD).  (*Id.*)

On December 23, 2011, Plaintiff's father took her to Green Oaks ER because she exhibited symptoms of psychosis, e.g., chanting and making nonsensical statements.  (R. at 2205-47.)  Plaintiff's psychotic symptoms were too severe for an initial assessment.  (R. at 2213.)  The next day, however, her psychotic symptoms disappeared, and a drug screening was positive for cocaine.  (R. at 2217.)  Erich Swafford, M.D., noted that "this [was] a fairly clear case of substance induced psychosis."  (*Id.*)  Even though Plaintiff reported that she had an underlying diagnosis of bipolar schizophrenia, Dr. Swafford considered it doubtful because all of her symptoms were well-accounted for by cocaine intoxication.  (*Id.*)  Plaintiff was discharged on December 24, 2011, with diagnoses of substance-induced psychosis disorder and cocaine dependence.  (*Id.*)

27

On December 27, 2011, George R. Mount, Ph.D., a consultative psychologist retained by Plaintiff's counsel, conducted a clinical interview and mental status examination of Plaintiff. (R. at 1593-95, 2173-75.) He diagnosed her with schizophrenia, PTSD, and dependent personality disorder. (R. at 1595, 2175.) Plaintiff completed a Millon Clinical Multiaxial Inventory-III (MCMI-III) that same day, and Dr. Mount observed that his diagnosis was consistent with the result. (*Id.*) The MCMI-III result was interpreted by Theodore Millon, Ph.D, D.Sc. (R. at 1596-99, 2176-84.) The MCMI-III profile suggested that the possible diagnosis for Axis II classifications were dependent personality disorder, schizotypal personality disorder with depressive personality traits, and borderline personality features. (R. at 1597) It also suggested that the possible diagnoses for Axis I clinical syndromes were schizophrenia, PTSD, and adjustment disorder with anxiety. (*Id.*)

Later that same day, Plaintiff's father took her to Green Oaks due to psychotic symptoms. (R. at 2254, 2257.) Plaintiff "appeare[ed] manic with psychosis" with pressured speech, loose associations, disorganization, and paranoia. (R. at 2255.) She was positive for cocaine. (R. at 2256, 2294.) Her diagnoses were schizoaffective disorder and cocaine dependence, and she was assigned a GAF score of 20.[21] (R. at 3223-24.) Plaintiff was discharged on January 2, 2012, in stabilized condition. (R. at 2286.) The discharge diagnosis was schizoaffective disorder, and Jahi Anderson, M.D., assigned a GAF score of 45. (R. at 2286, 3218.)

On January 6, 2012, Plaintiff's father filed an Application to Magistrate for Mental Illness Emergency Detention. (R. at 2406.) He claimed that Plaintiff was noncompliant with psychiatric treatment and used cocaine. (R. at 2408.) Plaintiff was threatening to kill her sister and herself, and

---

[21] A GAF score of 11-20 indicates that the patient's behavior "is considerably influenced by delusions or hallucinations" or "a serious impairment, in communication or judgment," or an "inability to function in almost all areas." DSM–IV–TR at 34.

she was accusing her family of attempting to kill her. (*Id.*) On the same day, a Dallas County magistrate judge signed an order commanding a peace officer to deliver Plaintiff to Green Oaks. (R. at 2409.) Pursuant to that order, a Dallas County Sheriff's Deputy brought Plaintiff to Green Oaks on January 11, 2012. (R. at 2499-500, 2677.) Plaintiff's father stated that she had stopped taking her medication since the last time she was released from Green Oaks. (R. at 2500.) Plaintiff tested positive for cocaine, and she admitted to using it. (R. at 2391-92, 2501, 2693.) Dr. Anderson examined Plaintiff, and no complaints of her physical functions were noted. (R. at 2399.) At discharge, Plaintiff was very happy and cheerful with her psychosis and delusions resolved, and her mood stabilized. (R. at 2383.) Her discharge diagnoses were schizoaffective disorder–bipolar type, and cocaine abuse. (R. at 2383, 3240.) Dr. Jose Vazquez also diagnosed her with discoid lupus, and a GAF score of 55-60[22] was assigned. (R. at 2383, 3240.) She was discharged on February 9, 2012. (R. at 2383, 2645, 2649, 2654.)

On February 19, 2012, Plaintiff went to Texas Health Arlington ER for a headache, where she saw Lawrence Chien, M.D. (R. at 2824.) A physical examination showed that Plaintiff was alert; all vital signs were normal; her head, nose, mouth, and eyes were normal; and her neck had a normal range of motion. (*Id.*) She had normal cardiovascular sounds, normal breathing, a normal abdominal area, normal range of joint motion, normal mood and affect, and her judgment and thought content were normal. (R. at 2825.) Lice was noted on her scalp. (*Id.*) The discharge diagnoses were headache and head lice infestation. (R. at 2828.) Plaintiff returned to Texas Health Arlington ER on February 26, 2012, complaining of a headache for the past week, chest pain and

---

[22] A GAF score of 51 to 60 indicates a "moderate" impairment in social, occupational, or school functioning. DSM–IV–TR, at 34.

29

shortness of breath.  (R. at 2796.)  She was alert and oriented to person, place, and time.  (R. at 2803.)  Her head was normal, her neck had a normal range of motion, and no abnormal cardiovascular issues or pulmonary or chest issues were noted.  (*Id.*)  She had a normal abdominal area, normal range of joint motion, normal mood and affect, and normal judgment and thought content.  (*Id.*)  There was no rash on her skin and no tenderness or edema was found on her joints.  (*Id.*)  A CT scan of Plaintiff's head showed no acute intracranial hemorrhage.  (R. at 2807.)  A chest x-ray also showed no active chest disease.  (*Id.*)  Dr. Chien diagnosed her with headache, chest pain, and lupus.  (R. at 2814.)

On February 29, 2012, Plaintiff saw Ratiapol Srisinroongruang, M.D., at Texas Health Arlington ER, for a possible insect bite on her right buttock.  (R. at 2846.)  The discharge diagnoses were insect bite and abscess.  (R. at 2849.)

On March 4, 2012, Plaintiff went to Texas Health Arlington ER for a headache and nausea., where she saw Daniel Kocurek, M.D.  (R. at 2838.)  A physical examination showed that her physical function was normal, but she reported that she had used cocaine the night before.  (R. at 2839.)  The discharge diagnoses were headache, nausea, and cocaine abuse.  (R. at 2741.)

On April 13, 2012, Plaintiff's father submitted an Application to Magistrate for Mental Illness Emergency Detention.  (R. at 2966.)  He reported that Plaintiff had been noncompliant with her psychiatric treatment, had hallucinations, and had threatened him.  (R. at 2966, 2968.)  She had been off her medications and had been living on the streets for the past three weeks.  (R. at 2961, 2855.)  A Dallas County magistrate judge signed an order for a peace officer to apprehend Plaintiff and deliver her to Green Oaks.  (R. at 2964.)

On April 17, 2012, Plaintiff was involuntarily admitted to Green Oaks, where Dr. Vazquez

examined her.  (R. at 2854, 2970-71.)  The initial diagnoses were schizoaffective disorder and lupus, and she was assigned a GAF score of 38.  (R. at 2994, 3150.)  She was positive for cocaine.  (R. at 2995.)  On April 27, 2012, Dr. Vazquez wrote a letter that was submitted to the ALJ prior to the second scheduled hearing, stating that Plaintiff "will not be psychiatrically stable on or before [May 1, 2012] in order to be available for her court appearance."  He further wrote that Plaintiff would not be ready to be discharged prior to May 1, 2012, nor be able to leave the hospital "due to her increased and continued symptoms[.]"  (R. at 160, 1607.)  Plaintiff was discharged on May 15, 2012.  (R. at 2958.)  The discharge diagnoses were schizoaffective disorder, discoid lupus, cocaine dependence, acute sinusitis, and migraine.  (R. at 2959, 3019.)  A GAF score of 55 was assigned.  (R. at 2959.)

On May 17, 2012, Plaintiff went to Dallas Regional Medical Center ER for a rash on her buttocks.  (R. at 3202-03.)  Amy Young, M.D., found mild cellulitis[23] on Plaintiff's buttocks.  (R. at 3205.)  Her discharge diagnoses were cellulitis, lupus, and rash.  (R. at 3202.)

### 3.    Hearing Testimony

On remand, the ALJ held three different hearings because Plaintiff did not attend the first two.  (R. at 58, 117-18, 157.)  At the first hearing on January 5, 2012, a medical expert (ME) and Plaintiff's father testified before the ALJ.  (R. at 58-88.)  A second hearing was held on May 1, 2012, but no testimony was taken.  (R. at 157-171.)  A third hearing was held on June 13, 2012, and Plaintiff and a vocational expert (VE) testified before the ALJ.  (R. at 117-156.)  Plaintiff was represented by an attorney at all three hearings.  (R. at 58, 117, 157.)

---

[23] "Cellulitis is a spreading infection that usually begins as a small area of tenderness, swelling, and redness on the skin."  *Your Skin and Cellulitis*, WebMD (Sept. 23, 2014, 11:05 AM), http://www.webmd.com/skin-problems-and-treatments/guide/cellulitis.

### a.      January 5, 2012 Hearing

At the first hearing, Plaintiff's attorney reported that Plaintiff was not present because she feared that people were trying to kill her.  (R. at 63-64.)

### i.      Plaintiff's Father's Testimony

Plaintiff's father, Timothy Young, testified that he and his wife sometimes took care of Plaintiff's baby.  (R. at 64.)  He said he observed changes in Plaintiff, and that she kept making nonsensical statements.  (*Id.*)  When the ME asked whether Plaintiff had continued going to Metrocare during her pregnancy, Mr. Young stated only that a doctor in Wichita Falls may have told her not to take prescribed mental medications.  (R. at 67.)  He said Plaintiff had resumed going to Metrocare only in the month or two prior to the hearing.  (*Id.*)  Mr. Young took Plaintiff to Green Oaks a couple of times because she talked about killing her sister.  (R. at 68.)  When the ALJ asked about Plaintiff's mother's mental health history, Mr. Young testified that he thought his ex-wife had some mental issues, but he was not engaged enough in her life to testify to it.  (R. at 69.)

### ii.      ME's Testimony

The ME, a board certified psychiatrist, testified as to her observations and conclusions based on the available record.  (R. at 69-75.)  She said Plaintiff's lupus was not extensive, i.e., did not cover all of her wrist, palms, and feet, and per a medical note by a rheumatologist on May 5, 2009, that Plaintiff showed no evidence of SLE.  (R. at 70-71.)  She could not find any evidence of ANA.[24] (R. at 72.)  The first social security consultative examiner in 2008 had observed no evidence of

---

[24] "An antinuclear antibody (ANA) test measures the amount and pattern of antibodies in your blood that work against your own body (autoimmune reaction)." *Antinuclear Antibodies (ANA)*, WebMD (Sept. 23, 2014, 11:06 AM), http://www.webmd.com/arthritis/antinuclear-antibodies-ana.

lupus.  (R. at 72.)  Two other consultative examiners only found evidence of discoid lupus.[25]  (*Id.*)

Although lupus was mentioned "a hundred times," there was no objective evidence of SLE.  (*Id.*)

For example, on July 29, 2011, Plaintiff went to the emergency room complaining of a lupus flare-

up, but "her SED rate[26] was 18[,] which [was] normal and it should be increased with the lupus

flare[.]"  (R. at 74.)  The ME noted that plaquenil was prescribed for Plaintiff's discoid lupus.  (R.

at 73.)  She concluded that although Plaintiff complained a lot about lupus, there was very little

objective evidence to support it.  (R. at 74-75.)  The ME noted that discoid lupus was perfectly

controllable.  (R. at 75.)

       In terms of Plaintiff's mental condition, the ME testified that Plaintiff's abuse of drugs was

noted as early as 2005, when she was admitted to Timberlawn Mental Health Systems because she

had been drinking and taking opiates, cocaine, and ecstasy on a regular basis.  (R. at 73.)  She also

noted that Plaintiff's urine drug screen was positive for cocaine in 2007.  (*Id.*)  On March 18, 2008,

when she was examined by a consultative examiner, Plaintiff denied taking drugs but in July 2008,

she was admitted to Green Oaks because she was acting bizarrely, and her mother reported that

Plaintiff had taken a lot of drugs over the July 4th weekend.  (*Id.*)  Her drug screen was negative, but

the ME noted that she had not been tested for ecstasy.  (*Id.*)  The ME cited to medical records from

August 26, 2008, and September 18, 2008, where Plaintiff admitted that she could not live without

---

[25]  "[Discoid lupus erythematosus] mainly affects skin that is exposed to sunlight and doesn't typically affect vital internal organs.  Discoid (circular) skin lesions often leave scars after healing of the lesions."  *Understanding Lupus–The Basics*, WebMD (Sept. 23, 2014, 11:08 AM), http://www.webmd.com/lupus/guide/understanding -lupus-basics.

[26]  "Sed rate, or erythrocyte sedimentation rate (ESR), is a blood test that can reveal inflammatory activity in your body. . . . A sed rate test measures the distance red blood cells fall in a test tube in one hour.  The farther the red blood cells have descended, the greater the inflammatory response of your immune system."  *Sed Rate (erythrocyte sedimentation rate)*, Mayo Clinic (Sept. 23, 2014, 11:09 AM), http://www.mayoclinic.org/tests-procedures/sed-rate/ basics/definition/prc-20013502.

drinking alcohol, was still abusing drugs, and was not taking her psychiatric medications.  (R. at 74.)

When Plaintiff was in jail in August 2008, she was reportedly suicidal, but she later denied it.  (*Id.*)

The doctor at the jail noted that she abused alcohol and assigned a GAF score of 75.  (*Id.*)  The ME

found a lot of records showing that Plaintiff was not taking her medications.  (*Id.*)  She noted that

Plaintiff was going to school on April 1, 2010.  (*Id.*)  When Plaintiff saw Dr. Mount for an

evaluation on December 27, 2011, she told him that she had never done drugs and that she last drank

three years ago.  (*Id.*)  Plaintiff would state that she saw the devil and heard voices, but the medical

records on her trips to ERs immediately prior and subsequent to such episodes showed that her

mental status was within normal limits.  (R. at 75.)  Dr. Fletcher observed that Plaintiff "was bizarre,

disheveled, [and a] poor historian,]" but when Plaintiff saw one of the consultative examiners two

months later, she was reported to be an excellent historian.  (*Id.*)  The ME also noted that Plaintiff

told two CEs and Dr. Fletcher that she had never done drugs, and that the last time she had consumed

alcohol was when she was 17 years old.  (*Id.*)

Plaintiff's attorney asked the ME's specialty, and the ME responded that she was a board

certified psychiatrist and had completed a one-year internal medicine internship.  (R. at 76.)

Plaintiff's attorney asked whether Plaintiff's drug and alcohol issues were caused by mental illness.

(*Id.*)  The ME testified that drugs were material to Plaintiff's condition, and that without drugs and

alcohol, she would not have the types of problems from which she was suffering.  (*Id.*)  When asked

whether it was possible that Plaintiff had a mental illness preceding the use of drugs and alcohol, the

ME responded that it was possible that Plaintiff had an underlying mental illness.  (*Id.*)  When asked

whether Plaintiff's failure to take her medications could be a function of a mental illness, the ME

responded affirmatively, but noted that Plaintiff was only interested in taking benzodiazepine,

34

"which [was a] drug[] of abuse." (R. at 76-77.) The attorney also asked whether Plaintiff's changing stories might be a sign of mental illness. The ME testified that it could be, but the changing stories about whether she had abused drugs and alcohol was not a function of mental illness. (*Id.*) The attorney pointed to the Parkland jail health record that assigned Plaintiff's GAF score at 75 and asked whether the ME observed any other place that had assigned Plaintiff with a GAF score anywhere close to that. (*Id.*) The ME agreed that the GAF score of 75 was an aberration. (R. at 77.) She had not otherwise observed a GAF score over 50, but noted that those scores also included Plaintiff's psycho-social issues and substance abuse issues. (R. at 78.) The ME testified that because of the concerns about accuracy of the GAF scores, she focused on the longitudinal record, progress notes, and any inconsistencies. (R. at 81.)

The attorney asked about the Millon test conducted by Dr. Mount. (*Id.*) The ME testified that the Millon test, even with internal checks for accuracy, relied on the credibility of the person taking it. (*Id.*)

Ultimately, the ME agreed that Plaintiff possibly had an underlying mental illness. (R. at 82.)

### b.    *May 1, 2012 Hearing*

The ALJ conducted a second hearing on May 1, 2012. (R. at 159.) She noted that Plaintiff's attorney had failed to submit recent medical records from Green Oaks, as the ALJ directed at the last hearing. (*Id.*) Stating that Plaintiff had been collecting social security disability benefits, the ALJ expressed concern about whether a fraud investigation needed to be conducted. (R. at 159, 165.) Plaintiff's attorney reported that Plaintiff had been admitted to Green Oaks. (R. at 159.) The ALJ reiterated that the issues were whether Plaintiff was mentally disabled or disabled by lupus, but noted that she never received any records from Green Oaks to review in making the disability

35

determination.  (R. at 162.)

        *c.*       *June 13, 2012 Hearing*

A final hearing was held on June 13, 2012.  (R. at 117-56.)  Plaintiff and a VE were present at the hearing.  (R. at 117-18.)

        *i.*       *Plaintiff's Testimony*

Plaintiff testified that she was 30 years old and had completed ninth grade.  (R. at 126, 149.) She worked at Ace Cash Express as a sales associate in 2001 and 2002.  (R. at 126.)  She worked at the cash register cashing checks, providing short term loans for customers, and depositing checks. (R. at 127.)  She was fired from the position because a co-worker had used her employee number to cash bad checks.  (R. at 139.)  From 2005 through 2007, Plaintiff worked at Lanpro Partnership, a department store.  (R. at 127-28.)  She started as a cashier and later became the head of the lay-away department.  (R. at 128.)  She did not oversee other employees, but part of her responsibility was to work as a secretary for the owners.  (*Id.*)  As a cashier, Plaintiff interacted with customers, ringing their purchases.  (R. at 128.)  Depression set in when she was working as the head of the lay-away department.  (R. at 129.)  That position required her to do a lot of bending, which was a cause of her depression, and she quit her job because of her manager, who at one time was her fiancé.  (R. at 130, 137.)

Plaintiff had worked full-time at Whataburger.  (R. at 137.)  She was a team leader in the beginning, but working at the grill made her lupus symptoms worse, so she was demoted to a cashier. (R. at 137-38.)  She enjoyed the job, but one of her co-workers stole money out of her register, and she said as a result she had to quit.  (R. at 137.)  She also worked at Fry's, but she quit the job because she smoked cigarettes, and the employer did not want anyone smoking.  (R. at 138.)

Plaintiff worked at D&L Entertainment, and even though she never quit, someone told her that she could not work in the future for D&L Entertainment because she had a felony record.  (R. at 139.)  Plaintiff also worked at Braums.  (R. at 139-40.)  She quit because the employer made her do all the work, and she did not like other people watching her while she was working.  (R. at 140.)  She also worked at KFC, but she quit because she felt she was treated differently from other employees.  (*Id.*)  Plaintiff testified that she'd had problems all of her life with other people who mistreated her.  (R. at 148.)

When questioned about her past drug and alcohol abuse, Plaintiff denied it and claimed that someone named Cornelia Young told her prior attorney that she was a heavy drug user.  (R. at 130.)  She testified she had never been an alcoholic, but she did drink alcohol in the past, and she had tried cocaine "more than one time."  (R. at 130-31.)  Plaintiff testified that she used cocaine once when she had a really bad toothache, hoping that it would ease the pain.  (R. at 131.)  The ALJ noted that Plaintiff's medical record showed polysubstance abuse as recent as March of 2012.  (R. at 131-32.)  The ALJ also pointed to the record that Plaintiff's behavior while staying at the Bridge and Adapt, that eventually led to her being admitted to Green Oaks in April 2012, seemed to be related to drug and alcohol use.  (R. at 132.)  Plaintiff testified that she only used some cocaine with her friends prior to going to the Bridge, and that she did not drink or use cocaine when she was staying at the Bridge.  (*Id.*)  The ALJ referred to the treatment records from Green Oaks and noted that she was encouraged not to do street drugs when discharged on May 15, 2012.  (R. at 133.)  Plaintiff denied having been told not to do street drugs.  (*Id.*)  She said that she did not have cocaine in her system, and she was not tested for drugs the last time she was at Green Oaks.  (*Id.*)  Plaintiff said that when a doctor from Green Oaks asked her about drug use, she told the doctor that she did not use cocaine,

and the doctor refused to prescribe narcotics for her head and back pain.  (R. at 133-34.)  She testified that she had used cocaine 10-15 times, but she did not have a cocaine problem.  (R. at 136-37.)

Plaintiff testified that she gave birth to her daughter on February 18, 2011.  (R. at 122.)  The ALJ asked Plaintiff whether her gestational diabetes and high blood pressure had resolved, and she answered affirmatively.  (R. at 122-23.)  When asked whether she had discoid lupus rather than SLE, Plaintiff answered that she had discoid lupus initially, but it turned into SLE.  (R. at 123.)  The ALJ noted that even though Plaintiff believed she had SLE, and some doctors had believed that diagnosis, the ALJ was unable to find real testing demonstrating that condition in the medical records.[27]  (R. at 123-24.)

Plaintiff testified that she was unable to work because her migraines caused her to lose her train of thought and made her feel like she was dying.  (R. at 144-45.)  She lost her hair overnight, had sores on her face, and started losing consciousness when she was pregnant.  (R. at 144.)  She could not be at work consistently because she had bad back pain.  (R. at 144-45.)  Plaintiff testified that she cried a lot because her life had been jumbled up, and a lot of things went wrong.  (R. at 145.)  She spent her days listening to music and being depressed.  (*Id.*)  Plaintiff was trying to find a primary care physician, but her father came one day and tried to touch her, so she escaped to the Bridge, and she testified everything had not been right since then.  (R. at 145-46.)  She took her medications as she was supposed to, but she ran out of them because of her migraines.  (R. at 147.)  When Plaintiff was asked how her migraines prevented her from taking her medications, she testified

---

[27]  Plaintiff's attorney agreed with the ALJ's observation.  (R. at 124.)  Since a lot of blood work had been done on Plaintiff, and the medical doctors had not clearly explained what the test results meant, he could not conclusively agree that Plaintiff had no SLE, however.  (R. at 124-25.)

that she was out of her medications for one week when she went to the Bridge to try to get away

from her father. (*Id.*) Plaintiff testified that she was jailed for outstanding traffic tickets. (R. at 147-

48.)

### ii.    VE's Testimony

A VE also testified at the hearing. (R. at 126, 149-52.) The VE classified Plaintiff's past

work as check cashier, DOT 211.462-026, sedentary and SVP 3;[28] cashier, checker, DOT 211.462-

014, light and SVP 3; lay away clerk, DOT 299.467-010, light and SVP 3. (R. at 129-30.)

The ALJ concluded that Plaintiff should not do her past relevant work because the jobs were

all semi-skilled. (R. at 149.) The ALJ asked the VE whether there were other jobs that could be

performed with the following limitations: running in age from approximately 25 to 30 with past

relevant work and a ninth grade education; no exertional limits; and mental limits of simple, routine,

repetitive tasks that require dealing with things and not people with "only occasional interaction with

crowds, public, co-workers, supervisors and no production rapid rate pace." (*Id.*) The VE answered

in the affirmative and listed the following examples of unskilled jobs: laundry worker, DOT

361.684-014, medium exertion, with 21,600 jobs nationally and 1,100 jobs in Texas; cleaner, DOT

323.687-010, medium exertion with 94,000 jobs nationally and 6,100 jobs in Texas; and photocopy

machine operator, DOT 207.685-014, light exertion with 17,000 jobs nationally and 1,600 jobs in

Texas. (R. at 149-50.)

Plaintiff's attorney asked the VE the maximum number of absences a month an individual

could have from a job on an ongoing basis before that individual could not be employed. (R. at 150.)

---

[28] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. An SVP of 3-4 corresponds to semi-skilled work, under the skill level definitions in 20 CFR 404.1568 and 416.968." SSR 00-4p.

The VE answered one to two absences a month, regardless of whether the absences were a whole day or half a day. (*Id.*) Plaintiff's attorney asked whether the employer would fire the individual if the individual was consistently an hour late to work, and the VE answered in the affirmative, regardless of reasons. (*Id.*) Plaintiff's attorney also asked whether ongoing problems with her supervisor would impact the individual's employability, and the VE answered that it would if the employee was unable to respond appropriately. (R. at 151.) When asked about the impact of verbal altercations with co-workers on employability, the VE testified that the individual "would have difficulty sustaining employment after a couple of altercations." (*Id.*) Plaintiff's attorney asked whether the positions the VE had listed required quotas. (*Id.*) The VE testified that they were not "production positions[,]" but they would require a "consistent pace" and "basic concentration". (R. at 151-52.) Plaintiff's attorney also asked whether a person's history of quitting jobs due to her inability to get along with people would reflect the difficulty in maintaining employment. (R. at 152.) The VE responded that unstable job history would pose difficulty in placement, but whether the pattern would continue would be a difficult judgment to make. (*Id.*)

At the end of the hearing, the ALJ stated that she intended to send the record and interrogatories to Dr. Barbara Felkins, who had served as an ME in the past two hearings, but was not able to attend the third hearing. (R. at 153.)

## C.      ME's Interrogatory Responses

Dr. Felkins determined that Plaintiff had bipolar schizoaffective disorder-severe, polysubstance abuse (cocaine recently, but also alcohol and ecstasy in the past), discoid lupus–no objective evidence of SLE, and migraine headaches–not frequent. (R. at 3410.) With regard to functional limitations, she determined that Plaintiff had mild restrictions on activities of daily living

and repeated episodes of decompensation, and moderate limitations on maintaining social functioning and maintaining concentration, persistence, or pace. (R. at 3411.) When Plaintiff was on drugs, her functional limitation was marked on maintaining social functioning, maintaining concentration, persistence, or pace, and repeated episodes of decompensation. (*Id.*) Dr. Felkins checked a section on the form stating that when mixed with substance abuse, Plaintiff's impairments met or medically equaled "the criteria for impairment described in the Listing of Impairments[.]" (R. at 3412.) If Plaintiff was sober and medication compliant, however, her impairments did not meet the Listing of impairments. (*Id.*) Dr. Felkins noted that the "[s]ubstance abuse [was] material." (*Id.*) Without the drug or alcohol abuse, Plaintiff "would not meet or equal a listing." (*Id.*) She noted that Plaintiff had been hospitalized in Timberlawn and Green Oaks in 2005 and 2008, and in Green Oaks 4-5 times in the prior 6-7 months, and every single hospitalization included a positive urine drug screen. (*Id.*) Dr. Felkins observed that Plaintiff was extremely psychotic when she was medication-noncompliant and abusing cocaine, but she had no problems requiring hospitalization during her recent pregnancy and between 2009 through 2011. (*Id.*) She noted that there was no evidence of SLE because there was no evidence of synovitis or inflamed joints, Plaintiff was treated for lupus only for a few months, and she was doing well with no joint pain when she was on plaquenil. (*Id.*) The medical evidence did not establish the presence of the (paragraph 9) "C" criteria. (R. at 3413.) She opined that Plaintiff had "no real objective evidence for [reduced] RFC, but given [her] subjective complaints, [Dr. Felkins] suggest[ed] light RFC[.]" (R. at 3414.)

In terms of mental RFC, Dr. Felkins found that Plaintiff had marked limitations on the following: understanding and remembering complex instructions, carrying out complex instructions, and the ability to make judgments on complex work-related decisions. (R. at 3416.) She further

noted that Plaintiff could follow simple instructions only.  (*Id.*)  She had moderate restrictions on the following: interact appropriately with the public, interact appropriately with supervisor(s), interact appropriately with co-workers, and respond appropriately to usual work situations and to changes in a routine work setting.  (R. at 3417.)  She referred to the definition of "moderate" and explained that a moderate restriction meant that Plaintiff was able to function satisfactorily.  (R. at 3416-17.)  She noted that Plaintiff "would perform best in a work environment in which contact with the public and coworkers would be incidental to the work performed, i.e., maid, manufacturing, etc."  (R. at 3417.)  Dr. Felkins stated that use of drugs and alcohol were material and that the mental RFC was "completed absent drug and alcohol abuse."  (*Id.*)  Her final observation was that Plaintiff might not be able to manage the benefits in her best interest because she might spend the benefits on drugs and alcohol.  (R. at 3418.)

## D.  ALJ's Findings

The ALJ issued her decision denying Plaintiff benefits on August 29, 2012.  (R. at 29-46.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 18, 2007, the alleged onset date.  (R. at 35.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "schizoaffective disorder, and polysubstance abuse[.]"  (*Id.*)  At step three, the ALJ determined that Plaintiff's impairments, including her polysubstance abuse disorder, met sections 12.04 and 12.09 of 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 404.1520(d) and 416.920(d)).  (R. at 37)  The ALJ found that absent her substance abuse, Plaintiff would still have a severe impairment, but it would not meet or equal any of the listed impairments. (R. at 40.)

Before proceeding to step four, the ALJ found that absent her substance abuse, Plaintiff

would have the RFC to "perform simple, routine, repetitive tasks that require dealing with things rather than people, require no more than occasional interaction with crowds, the public, and coworkers, occasional supervision, and do not require rapid rate pace or production." (R. at 41.) At step four, the ALJ determined that even if Plaintiff stopped her substance abuse, she would be unable to perform her past relevant work. (R. at 44.) At step five, the ALJ determined that Plaintiff could perform the jobs of a laundry worker, a cleaner, and a photocopy machine operator. (R. at 45.) The ALJ determined that Plaintiff's substance abuse disorder was a contributing factor material to the determination of disability, given that she "would not be disabled if she stopped the substance use." (*Id.*) The ALJ concluded that Plaintiff had not been disabled within the meaning of the Social Security Act at any time between the date of her application through the date of the decision. (*Id.*)

## II. ANALYSIS

### A. <u>Legal Standards</u>

#### 1. **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.

*Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id*. at 436 and n.1.

## 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."  *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant

is disabled:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that she cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir.

45

1987).

**B.      Issues for Review**

Plaintiff raises eight issues for review:

1.      The Appeals Council failed to follow its own internal rules, specifically Hallex Rule I-3-0-85(A), in refusing to grant counsel's request for additional time to provide any additional evidence and written arguments in connection with this matter, pursuant to the [Plaintiff's attorney's] letter of April 30, 2013;

2.      The ALJ apparently erred in basing her decision on an incorrect date last insured;

3.      In light of the rescission of Emergency Message 96-200, and its replacement by SSR 13-2p, the ALJ should be allowed to reconsider her decision in light of the new Ruling;

4.      The ALJ, who relied heavily on the testimony of the medical expert, should have found [P]laintiff disabled, as required by the evidence;

5.      The ALJ erred in failing to acknowledge all of [Plaintiff's] severe impairments;

6.      Pursuant to 20 C.F.R. § 404.989, there is "new and material" evidence which should have led the Appeals Council to reopen its Action of May 1, 2013, and which now should be sufficient to require, at least, remand of this claim;

7.      If the record does not contain the documents reviewed by the Social Security Administration in initially approving [P]laintiff's second set of applications, this case should, at least, be remanded under sentence 6, for further development; and

8.      The ALJ erred in not granting [P]laintiff's request to question Dr. Felkins at a supplemental hearing.

**C.      Hallex Rule I-3-0-85(A)**

Plaintiff argues that the Appeals Council's refusal to grant her an extension of time to provide additional evidence and arguments was a violation of its own internal procedure under HALLEX I-3-0-85(A). (Doc. 23 at 8-9.) She also asserts that the Appeals Council gave her only 20 days to submit additional evidence, which was less than the 25 days it initially stated it was giving her. (*Id.*)

Plaintiff contends that because she was prejudiced by the violations, remand is appropriate.  (*Id.*)

HALLEX I-3-0-85(A) states:

A claimant or the claimant's authorized representative (hereinafter "claimant") may request an extension of time to submit evidence or arguments.  The Appeals Council routinely allows 40 days for submission of evidence and arguments.  For second requests or initial requests for more than 40 days, the Council will consider the particular set of circumstances in each case. *The Council does not grant extensions automatically and will grant additional time only if there are extenuating circumstances present in the case.*

*Id.* (emphasis added).  "While HALLEX does not carry the authority of law, [the Fifth Circuit] has held that 'where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required.'"  *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)).  However, courts require "a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision."  *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001).

After the ALJ found Plaintiff not disabled on October 30, 2012, she appealed the ALJ's decision to the Appeals Council.  (R. at 27-28.)  On April 5, 2013, the Appeals Council sent her a copy of the administrative record and a letter explaining that she could submit additional evidence or arguments "within 25 days of the date of this letter."  (Docs. 23 at 5; 24 at 17; R. at 27-28.)  It further stated that it would "not allow more time to send information except for very good reasons."  (Doc. 24 at 17.)  On April 30, 2013, the last day to submit new evidence or arguments, Plaintiff sent a letter requesting an extension of time.  (*Id.* at 15.)  The Appeals Council denied the request on the same day, stating, incorrectly, that "[t]he current diary expired April 25, 2013."  (*Id.* at 12.)

The Fifth Circuit has not directly addressed this issue.  Even though HALLEX I-3-0-85(A)

states that "[t]he Appeals Council routinely allows 40 days for submission of evidence and arguments[,]" it also clarifies the authority to grant or deny a request for an extension by stating that "[t]he [Appeals] Council *does not* grant extensions automatically and will grant additional time *only if* there are extenuating circumstances present in the case." *Id.* (emphasis added).  Denial of an extension therefore did not violate the HALLEX rule.  Further, the Appeals Council's own letter warned that additional time would not be allowed "except for very good reasons." (Doc. 24 at 17.) Plaintiff has failed to show that the Appeals Council did not follow its own rules.

Plaintiff also argues that the Appeals Council initially stated that it was giving her 25 days to submit new evidence and arguments from the date of its letter, but its letter denying an extension seemed to state that it only gave her 20 days. (Doc. 23 at 8-9; 24 at 12.)  Even if this were an error, Plaintiff failed to show that she suffered prejudice as a result.  Her letter of April 30, 2013, the last day to submit additional evidence, did not identify any new evidence or arguments that she intended to submit to the Appeals Council, nor did it otherwise provide "very good reasons for an extension." Also, the requested extension of time was not denied until April 30, 2013, which was actually the last day to submit additional evidence absent an extension.

Moreover, the new evidence Plaintiff submitted on June 3, 2013, a motion to reopen to the Appeals Council, does not establish prejudice.  She argues that the new evidence is material to the ALJ's decision because according to the NorthSTAR Outpatient Authorization Tool completed by APN Lucas at Metrocare on November 23, 2011, she had "no substantive use, or substance use with NO adverse cognitive, behavioral, or physiological consequences related to the use of substances

within a 21-month (sic)[29] period." (Doc. 25 at 12.) She contends that this observation is material to the determination of whether substance abuse impacted her other impairments. (Doc. 23 at 14.) However, the ALJ noted that there had been no mental health treatment between September 2010 and November 2011 in the absence of substance abuse, the exact period to which APN Lucas was referring. (R. at 38, 42.) The ALJ observed that Plaintiff displayed psychosis when she was found to test positive for substance abuse, resulting in multiple involuntary psychiatric hospitalizations in 2012. (R. at 42.) The ALJ therefore concluded that Plaintiff's "symptoms in the absence of polysubstance abuse [were] not as limiting as she ha[d] alleged." (R. at 42.) The new evidence submitted by Plaintiff supports the ALJ's decision and Plaintiff has failed to show prejudice as required. *See Shave*, 238 F.3d at 597 (stating that courts require "a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision."). Therefore, remand is not required on this issue.

## D.   **Date Last Insured**

Plaintiff asserts that the ALJ erred by using December 30, 2011, as the date last insured (DLI) instead of December 30, 2012. (Doc. 23 at 10.) She contends that she was prejudiced by the ALJ's limited consideration of the record dated after December 30, 2011, which left that period "essentially unadjudicated." (*Id.*)

"To be eligible for conventional disability insurance benefits, an individual must first be insured." *Homan v. Comm'r of Soc. Sec. Admin.*, 84 F. Supp. 2d 814, 817 (E.D. Tex. 2000) (citing

---

[29] Plaintiff misquotes the sentence and states 21-months when the actual form says 12-months. (*See* doc. 23 at 14.)

42 U.S.C. § 423(a)(1)(A)).  "Insured status is the earnings requirement [a claimant] must meet in order to establish entitlement to any type of benefit or a period of disability based on his/her earnings record."  Social Security Administration Program Operations Manual System (POMS) RS 00301.101.  "An individual is insured if '[s]he had not less than 20 quarters of coverage during the 40 quarter period which ends with the quarter in which such months occurred.'"  *Homan*, 84 F. Supp. 2d at 817 (citing 42 U.S.C. § 423(c)(1)(B)).  "[Date Last Insured (DLI)] is the last day in the last quarter when disability insured status is met[,]" POMS RS 00301.148, and a claimant is required to establish that she "was disabled within the meaning of the [Social Security] Act" prior to the claimant's DLI.  *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972).

Here, the Commissioner does not dispute that the ALJ erred when she used December 30, 2011, as Plaintiff's DLI.  (Doc. 26 at 11.)  The Commissioner argues that Plaintiff was not prejudiced because the ALJ considered all the evidence through the date of her decision.  (*Id.*)

Plaintiff submitted the medical records for the following events after December 30, 2011: (1) an admission to Green Oaks from January 11, 2012 through February 9, 2012 (R. at 2499-500, 2654); (2) an ER visit for headache and head lice on February 19, 2012 (R. at 2824, 2828); (3) an ER visit for headache, chest pain, and lupus (R. at 2796, 2814); (4) an ER visit for an insect bite (R. at 2846, 2849); (5) an ER visit for headache and nausea as well as cocaine abuse (R. at 2838, 2741); (6) an admission to Green Oaks from April 17, 2012 through May 15, 2012 (R. at 2854, 2958, 2970-71); and (7) an ER visit for a rash on her buttocks (R. at 3202).  Of the seven visits to a medical facility that occurred in 2012, the ALJ referred to all but two in her decision.  (*See* R. at 37, 39.)  The two that the ALJ did not mention in the decision involved an insect bite and a rash on Plaintiff's buttocks.  (*See id.*)  The ALJ therefore considered all relevant evidence in the record, including the

50

evidence from the time period between December 30, 2011, and December 30, 2012. *See Gore v. Astrue*, 4:09-CV-095-A, 2010 WL 4053639 at \*5 (N.D. Tex. Sept. 15, 2010) (finding harmless error where the ALJ did consider medical evidence beyond his determined DLI) *report and recommendation adopted*, 4:09-CV-095-A, 2010 WL 4053563 (N.D. Tex. Oct. 13, 2010). Plaintiff failed to show that she was prejudiced by the ALJ's error in articulating her DLI because the ALJ considered all relevant evidence, and remand is not warranted on this issue.

**E.      Social Security Ruling 13-2P**

Plaintiff next argues that the ALJ should be allowed to reconsider her decision according to new Social Security Ruling (SSR) 13-2p, which became effective on March 22, 2013. (Doc. 23 at 10-11.) She argues that because the ALJ relied so heavily on Dr. Felkins's testimony and her interrogatory answers, the ALJ should be given an opportunity to use a correct standard under SSR 13-2p. (*Id.*)

An individual is not disabled if alcoholism or drug addiction is a contributing factor material to the determination of disability. *Gill v. Astrue*, No. 7:09–CV–155–O, 2010 WL 930999, at \*9 (N.D.Tex. Mar.15, 2010) (citing 42 U.S.C.A. § 1382c(a)(3)(J)). In determining whether the claimant's drug or alcohol addiction (DAA) is a contributing factor material to the determination of disability, the Commissioner considers whether the claimant would still be disabled if she discontinued using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1)(2012). If the claimant's remaining limitations after discontinuing substance abuse would not be disabling, DAA is a contributing factor material to the determination of disability, and the claimant is found not to be disabled. *Id.* § 404.1535(b)(2)(I). The claimant bears the burden of proving that her DAA is not a material factor contributing to her disability. *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir.1999); *Gill*, 2010 WL

51

930999, at *9.

Plaintiff relies on SSR 13-2p, which states in part: "[t]o support a finding that DAA is material, we must have evidence in the case record that establishes that a claimant with a co-occuring mental disorder(s) would not be disabled in the absence of DAA. Unlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder." SSR 13-2p.

Here, the ALJ gave Dr. Felkins's opinion great weight because it was consistent with Plaintiff's psychiatric medical history related to her DAA. (R. at 38-40.) The ALJ also cited medical treatment records that showed the relationship between Plaintiff's altered mental state and DAA. Those records showed that whenever Plaintiff was treated for altered mental status on the following dates, she was found positive for drugs and/or alcohol: in October 2007 (R. at 38), in March 2008 (R. at 709, 722), in February 2009 (R. at 955-68, 1617-18), in August 2009 (R. at 1130, 1610, 1612), twice in December 2011 (R. at 2205, 2217, 2256); in January 2012 (R. at 2499-500), and in April 2012 (R. at 2391-92, 2995). (R. at 38-40.) The ALJ did not exclusively depend on Dr. Felkins's opinion as alleged by Plaintiff.

Plaintiff also relies on the two sections in SSR 13-2p: "We will find that DAA is not material to the determination of disability and allow the claim if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA[,]" SSR 13-2p at *9; and "[i]f the evidence in the case record does not demonstrate the separate effects of the treatment for DAA and for the co-occurring mental disorder(s), we will find that DAA is not material," SSR 13-2p at *12. (Doc. 23 at 11.) These sections essentially require the ALJ to find evidence of separate effects of DAA and

52

the co-occuring mental disorders.  *See* SSR 13-2p.  Plaintiff argues that the ALJ used a different standard, but she does not explain how the ALJ's standard was different.  (Doc. 23 at 11.).  She simply contends that the ALJ should be given an opportunity to apply the standard in SSR 13-2p. (*Id.*)

The ALJ observed from the record that whenever Plaintiff was hospitalized for psychosis, substance abuse was involved,[30] but she received no mental health treatment and required no psychiatric hospitalizations when she did not abuse any substance.  (R. at 38-39, 42-43.)  She further noted that Plaintiff began attending Metrocare sessions again only a few months prior to the social security hearing.  (R. at 43.)  The medical evidence therefore demonstrated "the separate effects of the treatment for DAA and for the co-occurring mental disorders", and it "establish[ed] that [Plaintiff's] co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA[,]" as required by SSR 13-2p.  Plaintiff has not shown that application of the new standard as articulated under SSR 13-2p would result in a different outcome.  Remand is therefore not required.

## F.   Medical Expert's Opinion

Plaintiff contends that the ALJ should have found her disabled based on the ME's opinion, to which the ALJ gave "great weight[.]" (Doc. 23 at 11-12.)  Plaintiff argues that Dr. Felkins's word choice seems to suggest that Plaintiff does not meet the standards stated in SSR 85-15 and POMS DI 25020.010(B)(2).

SSR 85-15 states:

---

[30]   The ALJ noted that a drug screen was negative when Plaintiff was hospitalized in 2008, but her mother reported her recent cocaine and alcohol use.  (R. at 38.)

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to . . . respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15. POMS DI 25020.010(B)(2)(a) and (b) also states that "[t]he ability to work in coordination with or proximity to others without being (unduly) distracted by them" and "[t]he ability to get along with coworkers or peers without (unduly) distracting them or exhibiting behavior extremes." POMS DI 25020.010(B)(2)(a) and (b).

Here, Dr. Felkins opined in the interrogatory response that Plaintiff "would perform best in a work environment in which contact with the public and coworkers would be incidental to the work performed, i.e. maid, manufacturing, etc." (R. at 3417.) She further opined that Plaintiff could satisfactorily interact with the public and co-workers, if her interaction with them were incidental to the work to be performed. (R. at 3417.) Dr. Felkins's opinion therefore meets the requirements under SSR 85-15 and POMS DI 25020.010(B)(2)(a) and (b) and did not require the ALJ to find Plaintiff disabled.

## G.     Severe Impairments

Plaintiff argues that remand is required because the ALJ "fail[ed] to acknowledge all of [Plaintiff's] severe impairments.[31] (Doc. 23 at 13.)

### 1.     Lupus

Plaintiff contends the ALJ erred by not finding her lupus to be a severe impairment. (Doc.

---

[31] Plaintiff does not argue that the ALJ failed to apply the correct standard under *Stone v. Heckler*, 752 F.2d 1099 (5th Cir.1985). (*See* doc. 23 at 13.)

23 at 13.)

Plaintiff has the burden to establish that lupus was a severe impairment. *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987). Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir.1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work...." *Id.* at 1101.

Here, the ALJ specifically considered the medical records submitted by Plaintiff and found her lupus non-severe. (R. at 35-37.) She observed that Plaintiff was diagnosed with discoid lupus as a teenager, the medical records showed that she was frequently noncompliant with treatment and that she had limited treatment records with rheumatologists for the condition. (R. at 36.) Plaintiff frequently went to the ER complaining of lupus flare-ups and was prescribed hydrocodone, but the actual medical records did not reflect objective findings "proportional to [Plaintiff's] allegations." (R. at 36; *see* R. at 3358-59, 3366-67, 854, 908-11, 1110-11, 1157, 1102, 1142, 1253, 2153, 2170, 1486, 1480, 1510, 1520, 1549-50, 1553, 2803, 2824.) The ALJ observed that the consultative examinations done in 2008 and 2010 showed no evidence of lupus. (*Id.*) She also noted that the limited treatment records by rheumatologists showed that they consistently found Plaintiff to have

discoid lupus, not SLE.[32]  (*Id.*)

Reviewing the medical evidence, the ALJ agreed with Dr. Felkins that Plaintiff's discoid lupus was non-severe because "the extensive medical evidence of record documented no objective findings of functional limitations."  (R. at 35-37); *see Stone*, 752 F.2d at1101 (ruling that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.")*.*  Because the ALJ found that lupus did not cause any functional limitations based on the record submitted by Plaintiff, the ALJ's conclusion that lupus was not a severe impairment is supported by substantial evidence. *See Henderson v. Colvin*, 520 F. App'x 268, 275 (5th Cir. 2013) (observing that the ALJ applied the correct *Stone* standard when the ALJ found the claimant's stroke was non-severe by noting from the record that the claimant had no functional limitations resulting from her stroke).

Plaintiff cites to a discharge note from Texas Health Arlington ER on February 26, 2012, in support of her argument that lupus is a severe impairment.  (R. at 2814.)  Plaintiff's chief complaint for the ER visit, however, was a headache.  (R. at 2796, 2802.)  On physical examination, Plaintiff had no rash, erythema, edema, or tenderness.  (R. at 2797, 2803.)  The lupus diagnosis for the ER visit was not supported by objective medical evidence.  In her reply, Plaintiff states that the one citation was merely an example and points to her summary of medical evidence for more reference. (Doc. 27 at 5.)  In her summary of medical evidence, however, she cites to a Parkland record with discoid lupus diagnosis and Timberlawn discharge diagnoses dated prior to the disability onset date. (Doc. 23 at 7, R. at 599, 1000.)  Plaintiff failed to show that the ALJ erred by not finding her lupus

---

[32] Even Plaintiff's discharge diagnoses from Green Oaks in 2012 reflect that she had discoid lupus and not SLE.  (R. at 2382, 2959, 3019.)

to be a severe impairment.

### 2.     Other Mental Impairments

Plaintiff next argues that the ALJ should have found her other mental impairments, e.g.,

PTSD and bipolar disorder, to be severe.  (Doc. 23 at 13.)

As noted, "[t]he claimant has the burden of proving his disability[.]"  *Leggett*, 67 F.3d 558,

566 (5th Cir. 1995).  "The ALJ has a duty to develop facts fully and fairly, but reversal is appropriate

only if the applicant shows that he was prejudiced."  *Andablo v. Astrue*, No. 3:12-CV-0560-D, 2012

WL 4893215, at *4 (N.D. Tex. Oct. 16, 2012) (Fitzwater, C.J.) (quoting *Ripley v. Chater*, 67 F.3d,

552, 557 (5th Cir. 1995)) (internal quotation marks omitted).  "The ALJ's duty to investigate,

though, does not extend to possible disabilities that are not alleged by the claimant or to those

disabilities that are not clearly indicated on the record."  *Leggett*, 67 F.3d at 566.  Further, to support

remand based on a failure to fully develop the record, a disability claimant must show that the ALJ's

failure to develop the record prejudiced the claimant.  *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir.

2000).  Prejudice is established if a claimant shows that she "could and would have adduced

evidence that might have altered the result" reached by the ALJ.  *Id.* (citing *Kane v. Heckler*, 731

F.2d 1216, 1220 (5th Cir. 1984)).

Here, Plaintiff raises PTSD and bipolar disorder as impairments for the first time before this

Court.  (*See* doc. 24 at 9; R. 32, 58-88,m 117, 71, 258-83, 294-319, 331-58, 361-79.)  Further, the

medical record has sparse mention of the impairments, and there is no evidence that Plaintiff sought

separate treatments for PTSD or bipolar disorder.  *See Sweeten v. Astrue*, No. 3:11-CV0934-G-BH,

2012 WL 3731081 (N.D. Tex. Aug. 13, 2012) (finding no error in the ALJ's failure to consider

anxiety as a severe impairment where the plaintiff failed to claim anxiety as an impairment before

the ALJ, the medical records showed only an occasional display of symptoms, and she never sought

treatment for anxiety).   The ALJ's failure to find Plaintiff's PTSD and bipolar disorder severe

impairments was not an error when Plaintiff failed to raise it before the ALJ or the Appeals Council,

and the record only shows sporadic mention of the conditions.  *See Leggett*, 67 F.3d at 566

("Because [the claimant] never raised the issue of mental impairment until this appeal, [the claimant]

cannot say that he put his mental impairments before the ALJ."); *Andablo v. Astrue*, No. 3:12-CV-

0560-D, 2012 WL 4893215 (N.D. Tex. Oct. 16, 2012) (finding that the ALJ did not err in failing to

consider education or intelligence as a possible limitation when the claimant first asserted the

limitation in his brief to the Appeals Council because the ALJ's duty did not extend to investigating

possible disabilities not alleged by the claimant).

      Even if Plaintiff had raised PTSD and bipolar disorder as impairments, however, she cannot

show prejudice because the two doctors' opinions that diagnosed Plaintiff with PTSD and bipolar

disorder were given little weight by the ALJ.  (R. at 39, 43.)  Dr. Mount diagnosed Plaintiff with

PTSD, but the ALJ gave Dr. Mount's opinion little weight because Plaintiff had been admitted to

Green Oaks for cocaine-induced psychosis within hours of his examination.  (R. at 39.)  The ALJ

likewise gave little weight to the opinion of Dr. Lankford, an SAMC, who diagnosed Plaintiff with

bipolar disorder, because a substantial volume of the medical records were submitted after his

review.  (R. at 43.)  Plaintiff has not demonstrated prejudice, and remand is not required on this

issue.

**H.**     **New Evidence**

      Plaintiff asserts that the Appeals Council should have reopened her case based on the new

evidence she had submitted.  (Doc. 23 at 13-14.)  She contends that because the ALJ made her

decision "based on an incomplete record," remand is appropriate.  (*Id.* at 13.)

If a claimant submits new and material evidence that relates to the period before the ALJ's decision, the Appeals Council must consider the evidence in deciding whether to grant a request for review of an ALJ's decision.  20 C.F.R. § 404.970(b).  Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based.  *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir.2005).  A court considering that final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported.  *Higginbotham v. Barnhart*, 163 F. App'x 279, 281–82 (5th Cir.2006).

Here, Plaintiff argues that according to the NorthSTAR Outpatient Authorization Tool completed by APN Lucas at Metrocare on November 23, 2011, Plaintiff had "no substantive use, or substance use with NO adverse cognitive, behavioral, or physiological consequences related to the use of substances within a 21-month period."  (Doc. 25 at 12.)  She claims that this observation is material to the determination of whether substance abuse impacted her other impairments.  (Doc. 23 at 14.)  As already discussed under section C, the new evidence supports the ALJ decision rather than dilutes, the ALJ decision.  Remand is therefore not required.  *Higginbotham*, 163 F. App'x. at 281–82.

I.     **Missing Evidence**

Plaintiff contends that the record from her second application for benefits is missing, and that remand is appropriate.  (Doc. 23 at 14.)

"The Fifth Circuit has determined that trial courts should not reverse or remand

59

determinations because documents are missing where the record contains enough evidence for the ALJ to make a determination. *Quintanilla v. Astrue*, 619 F.Supp.2d 306, 325 (S.D. Tex. 2008) (citing *Torres v. Shalala*, 48 F.3d 887, 894 (5th Cir. 1995)); *see also Brady v. Apfel*, 41 F.Supp.2d 659, 668 (E.D. Tex. 1999) (declining to rule that incomplete administrative record is a *per se* due process violation). Here, Plaintiff is not arguing that the record is "patently inadequate. . . . and has not demonstrated that [the missing record] affected the ability of the ALJ to render an informed decision[.]" *Torres*, 48 F.3d at 894. She is not even certain whether records are actually missing, due to the sheer volume of the administrative record. (Doc. 23 at 14.)

The ALJ's decision stated that she had considered the consultative psychological examination from July 2010, which was the basis for allowing Plaintiff's subsequent claim, although she gave the findings little weight. (R. at 43.) "A mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient [to show that prejudice resulted from the error]." *Jones v. Astrue*, 691 F.3d 720, 734 (5th Cir. 2012). Plaintiff has failed to show any prejudice arose from the missing record. The administrative record, consisting of 3,421 pages of Plaintiff's medical records for the relevant period, contains enough evidence for the ALJ to make a determination. *See Quintanilla*, 619 F.Supp.2d at 325.

**J.      Attendance of Dr. Felkins at the Supplemental Hearing**

Plaintiff contends that the ALJ erred by not granting her an opportunity to question Dr. Felkins about her qualifications despite her request for the opportunity, to the extent that the ALJ relied on Dr. Felkins's opinion on Plaintiff's physical limitations. (Doc. 23 at 14.)

In general, claimants bear the burden to present all evidence relevant to their claims of disability. 20 C.F.R. § 416.912(a). The ALJ, however, has a duty to fully and fairly develop the

60

facts relevant to a claim for benefits.  *Carey*, 230 F.3d at 142.  As already noted, to support remand based on a failure to fully develop the record a claimant must show that the ALJ's failure to develop the record prejudiced the claimant. *Id.*  Prejudice is established if a claimant shows that she "could and would have adduced evidence that might have altered the result" reached by the ALJ.  *Id.* (citing *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)).

Plaintiff cites to the portion of the ALJ's decision where she gave little weight to Dr. Felkins's opinion on Plaintiff's physical RFC and argues that she should have been given an opportunity to question Dr. Felkins on her qualifications to opine about physical limitations.  (Doc. 23 at 14; R. at 37.)  The ALJ gave little weight to Dr. Felkins's physical RFC opinion because it relied on Plaintiff's subjective complaints.  (R. at 37.)  It is unclear how Plaintiff's ability to question Dr. Felkins's qualifications to opine about her physical limitations might have altered the result when the opinion was given little weight.  Further, Dr. Felkins had submitted her resume prior to the first two hearings she attended.  (R. at 286-87, 326-27.)  During the first hearing on January 5, 2012, Plaintiff's attorney had an opportunity to question Dr. Felkins.  She testified that she was a board certified psychiatrist with one year of internal medicine internship experience.  (R. at 76.)  Plaintiff fails to show that she "could and would have adduced evidence that might have altered the result" reached by the ALJ if she had a further chance to question Dr. Felkins on her qualifications.  *Carey*, 230 F.3d at 142.

### III.  CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED on this 30th day of September, 2014.**

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**